Barry I. Levy (BL 2190)
Michael A. Sirignano (MS 5263)
Joshua D. Smith (JS 3989)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY, and GEICO
CASUALTY COMPANY,

Plaintiffs,

-against-

NASSAU QUEENS MEDICAL P.C., TONUCA BASU,
M.D., PRADIP SEDANI, M.D., RAPAPUNCTURE
MEDICAL P.C., GIDEON RAPAPORT, M.D., ALINA
AMINOVA, L.AC., NATALIA BRIGHT, L.AC., YC
ACUPUNCTURE, P.C., YURI CHOI, L.AC., GOOD
CARE PHYSICAL THERAPY P.C., SUN JOO KIM,
P.T., EVERGREEN PHYSICAL THERAPY
REHABILITATION, P.C., HYUNGTAE KIM, P.T.,
FOUR SEASONS CHIROPRACTIC P.C., DONG
HAWN LEE, D.C., ASAP CHIROPRACTIC P.C.,
SAMUE PARK, D.C., MICHAEL KIMMEL, D.C.,

DAVINDER SINGH, MILLENNIUM HEALTH
MANAGEMENT, INC., and JOHN DOE
DEFENDANTS NOS. 1-5,

Defendants.

------------------------------------------------------------------X

Docket No.:_____

**Plaintiff Demands a
Trial by Jury**

**<u>COMPLAINT</u>**

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1.       This action seeks to recover more than $1,800,000.00 that the Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent No-fault insurance charges relating to medically unnecessary, illusory, and otherwise non-reimbursable healthcare services, including purported examinations, electrodiagnostic testing, physical therapy, chiropractic, and acupuncture (collectively the "Fraudulent Services") allegedly provided to New York automobile accident victims ("Insureds"), as part of a scheme to exploit New York's No-fault insurance system.

2.       The Fraudulent Services were provided, to the extent that they were provided at all, pursuant to the dictates of unlicensed laypersons that illegally owned and controlled two medical clinics located at 295 Hempstead Turnpike, Elmont, New York (the "Hempstead Tpke. Clinic") and at 66-42 Myrtle Avenue, Glendale, New York (the "Myrtle Ave Clinic"), as well as the purported healthcare practices operating therefrom, including Defendants Nassau Queens Medical P.C. ("NQ Medical"), Rapapuncture Medical P.C. ("Rapapuncture"), YC Acupuncture, P.C. ("YC Acupuncture"), Good Care Physical Therapy P.C. ("Good Care PT"), Evergreen Physical Therapy Rehabilitation P.C. ("Evergreen PT"), Four Seasons Chiropractic P.C. ("Four Seasons Chiro"), and ASAP Chiropractic P.C. ("ASAP Chiro"), as well as numerous unincorporated professional practices operating under professional licenses belonging to Defendants Pradip Sedani, M.D. ("Sedani Medical"), Alina Aminova, L.Ac. ("Aminova

Acupuncture"), Natalia Bright, L.Ac. ("Bright Acupuncture"), Yuri Choi, L.Ac., ("Choi Acupuncture"), and Michael Kimmel, D.C. ("Kimmel Chiro").

3.  In addition to recovering the monies stolen from it, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $2,700,000.00 in pending no-fault insurance claims that have been submitted by or on behalf NQ Medical, Rapapuncture, YC Acupuncture, Good Care PT, Evergreen PT, Four Seasons Chiro, ASAP Chiro, Sedani Medical, Aminova Acupuncture, Bright Acupuncture, Choi Acupuncture, and Kimmel Chiro (collectively the "Provider Defendants") because:

(i)  the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(ii)  the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO;

(iii)  NQ Medical, Rapapuncture, YC Acupuncture, Good Care PT, Evergreen PT, Four Seasons Chiro, ASAP Chiro, Sedani Medical, Aminova Acupuncture, Bright Acupuncture, Choi Acupuncture, and Kimmel Chiro were fraudulently and unlawfully incorporated, owned, and/or controlled by unlicensed individuals and entities, unlawfully split fees with unlicensed individuals and entities, and, therefore, were ineligible to bill for or to collect no-fault benefits;  and

(iv)  in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by the Provider Defendants or their employees as required under the No-fault laws.

4.  The Defendants fall into the following categories:

(i)  NQ Medical, Rapapuncture, YC Acupuncture, Good Care PT, Evergreen PT, Four Seasons Chiro, ASAP Chiro, Sedani Medical, Aminova Acupuncture, Bright Acupuncture, Choi Acupuncture, and Kimmel Chiro, i.e., the Provider Defendants, are fraudulently incorporated, owned, and/or controlled professional corporations (or, in the case of Sedani Medical, Aminova Acupuncture, Bright Acupuncture, Choi Acupuncture, and Kimmel Chiro, unincorporated healthcare practices) through which the Fraudulent Services purportedly were performed and billed to insurance companies, including GEICO.

3

(ii)     Defendants Tonuca Basu, M.D. ("Basu"), Pradip Sedani, M.D. ("Sedani"), Gideon Rapaport, M.D. ("Rapaport"), Alina Aminova, L.Ac., ("Aminova"), Natalia Bright, L.Ac. ("Bright"), Yuri Choi, L.Ac. ("Choi"), Sun Joo Kim, P.T. ("S. Kim"), Hyungtae Kim, P.T. ("H. Kim"), Dong Hawn Lee, D.C. ("Lee"), Samue Park, D.C. ("Park"), and Michael Kimmel, D.C. ("Kimmel") (collectively the "Nominal Owner Defendants") are licensed medical professionals that falsely purported to own and control the Provider Defendants, and purported to perform many of the Fraudulent Services.

(iii)    Defendants Davinder Singh ("Singh"), Millenium Health Management, Inc. ("Millenium Health") and John Doe Defendants 1-5 (collectively the "Management Defendants") are not and never have been licensed healthcare professionals, yet nonetheless secretly and unlawfully owned, controlled, and derived economic benefit from the Provider Defendants' healthcare practices in contravention of New York law.

5.      As discussed below, Defendants at all relevant times have known that:

(i)      the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(ii)     the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO;

(iii)    NQ Medical, Rapapuncture, YC Acupuncture, Good Care PT, Evergreen PT, Four Seasons Chiro, ASAP Chiro, Sedani Medical, Aminova Acupuncture, Bright Acupuncture, Choi Acupuncture, and Kimmel Chiro were fraudulently and unlawfully incorporated, owned, and/or controlled by unlicensed individuals and entities, unlawfully split fees with unlicensed individuals and entities, and, therefore, were ineligible to bill for or to collect no-fault benefits;  and

(iv)     in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by the Provider Defendants or their employees as required by the No-fault laws.

6.      As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that have been billed to GEICO through the Provider Defendants.

7.      The charts annexed hereto as Exhibits "1" – "12" set forth a representative sample of the fraudulent claims that have been identified to-date that the Defendants have submitted, or caused to be submitted, to GEICO.

8.      The Defendants' fraudulent scheme has continued uninterrupted through the present day.

9.      As a result of the Defendants' scheme, GEICO has incurred damages of more than $1,800,000.00.

## THE PARTIES

10.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

11.      Defendant Basu resides in and is a citizen of New York. Basu was licensed to practice medicine in New York on February 10, 1998, falsely purported to own and control Defendant NQ Medical, and purported to provide many of the Fraudulent Services.

12.      Defendant NQ Medical is a fraudulently and unlawfully owned and controlled New York medical professional corporation with its principal place of business in New York, through which many of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO.

13.      NQ Medical was incorporated on May 21, 2014, is nominally owned on paper by Basu, but in actuality has been owned and controlled by unlicensed non-physicians in contravention of New York law.

14.     Defendant Sedani resides in and is a citizen of New York. Sedani was licensed to practice medicine in New York on May 12, 1978, falsely purported to own and control Sedani Medical, and purported to provide many of the Fraudulent Services.

15.     Sedani Medical is an unincorporated medical practice that is purportedly owned by Sedani, but in actuality has been owned and controlled by unlicensed, non-physicians.

16.     Defendant Rapaport resides in and is a citizen of New York. Rapaport was licensed to practice medicine in New York on July 1, 1985, falsely purported to own and control Defendant Rapaport Medical, and purported to provide some of the Fraudulent Services.

17.     Defendant Rapapuncture is a fraudulently and unlawfully owned and controlled New York medical professional corporation with its principal place of business in New York, through which many of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO.

18.     Rapapuncture was incorporated on June 26, 2013, is nominally owned on paper by Rapaport, but in actuality has been owned and controlled by unlicensed non-medical professionals in contravention of New York law.

19.     Defendant Aminova resides in and is a citizen of New York. Aminova was licensed to practice acupuncture in New York on January 24, 2014, falsely purported to own and control Aminova Acupuncture, and purported to provide many of the Fraudulent Services.

20.     Aminova Acupuncture is an unincorporated acupuncture practice that is purportedly owned by Aminova, but in actuality has been owned and controlled by unlicensed, non-medical professionals.

21.     Defendant Bright resides in and is a citizen of New York. Aminova was licensed to practice acupuncture in New York on November 15, 2010, falsely purported to own and control Bright Acupuncture, and purported to provide many of the Fraudulent Services.

22.     Bright Acupuncture is an unincorporated acupuncture practice that is purportedly owned by Bright, but in actuality has been owned and controlled by unlicensed, non-medical professionals.

23.     Defendant Choi resides in and is a citizen of New York. Rapaport was licensed to practice acupuncture in New York on June 4, 2014, falsely purported to own and control Defendant YC Acupuncture and Choi Acupuncture, and purported to provide some of the Fraudulent Services.

24.     Defendant YC Acupuncture is a fraudulently and unlawfully owned and controlled New York acupuncture professional corporation with its principal place of business in New York, through which many of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO.

25.     YC Acupuncture was incorporated on February 21, 2017, is nominally owned on paper by Choi, but in actuality has been owned and controlled by unlicensed non-medical professionals in contravention of New York law.

26.     YC Acupuncture is an unincorporated acupuncture practice that is purportedly owned by Bright, but in actuality has been owned and controlled by unlicensed, non-medical professionals.

27.     Choi Acupuncture is an unincorporated acupuncture practice that is purportedly owned by Choi, but in actuality has been owned and controlled by unlicensed, non-medical professionals.

28.     Defendant S. Kim resides in and is a citizen of New York. S. Kim was licensed to practice physical therapy in New York on December 21, 2009, falsely purported to own and control Defendant Good Care PT, and purported to provide some of the Fraudulent Services.

29.     Defendant Good Care PT is a fraudulently and unlawfully owned and controlled New York physical therapy professional corporation with its principal place of business in New York, through which many of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO.

30.     Good Care PT was incorporated on April 28, 2014, is nominally owned on paper by S. Kim, but in actuality has been owned and controlled by unlicensed non-medical professionals in contravention of New York law.

31.     Defendant H. Kim resides in and is a citizen of New York. H. Kim was licensed to practice physical therapy in New York on January 11, 2006, falsely purported to own and control Defendant Evergreen PT, and purported to provide some of the Fraudulent Services.

32.     Defendant Evergreen PT is a fraudulently and unlawfully owned and controlled New York physical therapy professional corporation with its principal place of business in New York, through which many of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO.

33.     Evergreen PT was incorporated on November 17, 2017, is nominally owned on paper by H. Kim, but in actuality has been owned and controlled by unlicensed non-medical professionals in contravention of New York law.

34.     Defendant Park resides in and is a citizen of New Jersey. Park was licensed to practice chiropractic in New York on August 14, 2000, falsely purported to own and control Defendant ASAP Chiro, and purported to provide some of the Fraudulent Services.

35.     Defendant ASAP Chiro is a fraudulently and unlawfully owned and controlled New York chiropractic professional corporation with its principal place of business in New York, through which many of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO.

36.     ASAP Chiro was incorporated on April 14, 2014, is nominally owned on paper by Lee, but in actuality has been owned and controlled by unlicensed non-medical professionals in contravention of New York law.

37.     Defendant Lee resides in and is a citizen of New York. Lee was licensed to practice chiropractic in New York on April 16, 2013, falsely purported to own and control Defendant Four Seasons Chiro, and purported to provide some of the Fraudulent Services.

38.     Defendant Four Seasons Chiro is a fraudulently and unlawfully owned and controlled New York chiropractic professional corporation with its principal place of business in New York, through which many of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO.

39.     Four Seasons Chiro was incorporated on October 24, 2016, is nominally owned on paper by Lee, but in actuality has been owned and controlled by unlicensed non-medical professionals in contravention of New York law.

40.     Defendant Kimmel resides in and is a citizen of New York. Kimmel was licensed to practice chiropractic in New York on August 24, 2000, falsely purported to own and control Kimmel Chiro, and purported to provide many of the Fraudulent Services.

41.     Kimmel Chiro is an unincorporated chiropractic practice that is purportedly owned by Kimmel, but in actuality has been owned and controlled by unlicensed, non-medical professionals.

42.     Defendant Singh resides in and is a citizen of New York. Singh has never been a licensed healthcare professional, yet has owned, controlled, and derived economic benefit from the Provider Defendants in contravention of New York law.

43.     Defendant Millennium Health is a New York corporation with its principal place of business in New York.

44.     Millennium Health was incorporated on November 17, 2000, is owned on paper by Singh and Basu, and purports to be a health management company that leases space to the Provider Defendants.

45.     In actuality, Millennium Health has been used by Singh and John Doe Defendants to illegally own and control the Provider Defendants, to siphon revenues from the Provider Defendants to unlicensed laypersons, and to dictate the Provider Defendants' predetermined treatment and billing protocols, without regard for genuine patient care.

46.     Upon information and belief, John Doe Defendants 1 – 5 reside in and are citizens of New York. John Doe Defendants 1 – 5 are individuals and entities, presently not identifiable, who are not and never have been licensed healthcare professionals, yet – together with Singh and Millennium Health – have owned, controlled, and derived economic benefit from the Provider Defendants in contravention of New York law.

## JURISDICTION AND VENUE

47.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

48.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act) because they arise under the laws of the United States.

49.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

50.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

I.     **An Overview of the No-Fault Laws and Licensing Statutes**

51.     GEICO underwrites automobile insurance in New York.

52.     New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

53.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services, including physician services, physical therapy services, and acupuncture services.

54.     An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.  Pursuant to a duly executed assignment, a health

care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").  In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

55.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they are unlawfully incorporated or fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

56.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … .

57.     In New York, only a licensed healthcare professional may: (i) practice the pertinent healthcare profession; (ii) own and control a professional corporation authorized to operate a professional healthcare practice; (iii) employ and supervise other healthcare professionals; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from healthcare professional services. Unlicensed individuals may not: (i) practice the pertinent healthcare profession; (ii) own or control a professional corporation authorized to operate a professional healthcare practice; (iii) employ or supervise healthcare professionals; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from professional healthcare services.

58.     New York law prohibits licensed healthcare providers from paying or accepting kickbacks in exchange for patient referrals. See, e.g., New York Education Law §§ 6509-a; 6531.

59.     Additionally, New York law requires the shareholders of a professional corporation to be engaged in the practice of their profession through the professional corporation in order for it to be lawfully licensed. See, e.g., N.Y. Business Corporation Law § 1507.

60.     Therefore, under the No-Fault Laws, a healthcare provider is not eligible to receive No-Fault Benefits if it is fraudulently incorporated, fraudulently licensed, if it engages in unlawful fee-splitting with unlicensed non-professionals, if it pays or receives unlawful kickbacks in exchange for patient referrals, or if its record owner does not practice his or her profession through the professional corporation.

61.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

62.     Pursuant to the No-Fault Laws, only healthcare services providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her healthcare services provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits directly to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

63.     Accordingly, for a healthcare provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to Insurance Law § 5102(a), it must be the

_actual_ provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

64.    In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "Fee Schedule")

65.    When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

66.    Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.    **The Defendants' Fraudulent Scheme**

67.    Beginning in 2013, and continuing through the present day, the Defendants masterminded and implemented a complex fraudulent scheme in which they billed GEICO and other automobile insurers millions of dollars for medically unnecessary, illusory, and otherwise non-reimbursable healthcare services pursuant to the illegal control of unlicensed laypersons.

68.     In or about late 2013, Singh, Millennium Health, and John Doe Defendants 1-5 commenced a search for licensed medical professionals who would be willing to sell the use of their professional licenses to the Management Defendants so that the Management Defendants could fraudulently incorporate, own, and control a series of professional corporations and unincorporated healthcare practices under the licensed professionals' names. The Management Defendants sought to purchase the use of the professional licenses in order to submit large-scale fraudulent no-fault billing to New York no-fault insurers under the names of the Provider Defendants.

69.     The Provider Defendants did not advertise or market their services to the general public and were not the owners or direct leaseholders of the real property from which they purported to provide the Fraudulent Services.

70.     Instead, the Provider Defendants operated from at least two multidisciplinary clinics owned and controlled by Singh, Millennium Health, and John Doe Defendants 1-5, i.e., the Singh Clinics.

71.     As part of the Defendants' fraudulent scheme, Singh purported to be the office manager at both the Hempstead Tpke Clinic and Myrtle Ave Clinic.

72.     In actuality, Singh used the façade of "office manager" to unlawfully own and control every aspect of the professional corporations and unincorporated practices operating from the Singh Clinics, including the operations of the Provider Defendants.

73.     In keeping with Singh's control over the Singh Clinics and the professional corporations and unincorporated practices operating therefrom, Singh has remained as the "office manager" for several years, despite numerous changes in the professional practices and medical professionals working from the locations.

74.     Despite a revolving door of healthcare providers at both of the Singh Clinics, Singh remained the one constant at the locations, purporting to be the office manager, but in actuality unlawfully owning and controlling numerous healthcare practices.

75.     In keeping with Singh's control over the Singh Clinics, virtually every Insured who was treated at the clinics was subjected to a virtually identical, medically unnecessary course of "treatment" that was provided without regard to patient care, pursuant to predetermined, fraudulent protocols designed to maximize the billing, and not reflective of the exercise of genuine medical judgment.

**A.      The Fraudulent Incorporation and Operation of the Provider Defendants**

**1.      The Fraudulent Incorporation and Operation of NQ Medical**

76.     Beginning in or about late 2013, the Management Defendants recruited Basu**,** a licensed physician, who was willing to sell to the Management Defendants the use of her professional license, so that the Management Defendants could fraudulently incorporate NQ Medical.

77.     In order to circumvent New York law preventing non-medical professionals from owning and controlling medical professional corporations, the Management Defendants entered into a secret scheme with Basu, wherein, in exchange for a designated salary or other form of compensation, Basu agreed to falsely represent in the certificate of incorporation and related filings with New York State, that she was the true shareholder, director, and officer of NQ Medical and that she truly owned, controlled, and practiced through the professional corporation.

78.     Basu did this knowing that the professional corporation would be used to submit fraudulent billing to insurers.

79.     Once NQ Medical was fraudulently incorporated, Basu ceded true beneficial ownership and control over NQ Medical to the Management Defendants.

80.     Basu did not incur any costs to establish NQ Medical's practice, nor did she invest any money in the professional corporation she purportedly owned subsequent to the purchase of her medical license by the Management Defendants.

81.     Upon fraudulent incorporation, the Management Defendants caused the Provider Defendants to commence operations from the Hempstead Tpke Clinic and the Myrtle Ave Clinic (collectively the "Singh Clinics"), two different multi-disciplinary no-fault clinics owned and/or controlled by the Management Defendants.

82.     The Management Defendants – rather than Basu – provided all costs associated with establishing NQ Medical in the Singh Clinics, and all investment in NQ Medical subsequent to the purchase of Basu's medical license by the Management Defendants in late 2013.

83.     Basu never was the true shareholder, director, or officer of NQ Medical, and never had any true ownership interest in or control over any of the professional corporations. True ownership and control over NQ Medical always rested entirely with the Management Defendants, who used the façade of the Provider Defendants to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

84.     Basu exercised little to no control over or ownership interest in the Provider Defendant.

85.     All decision-making authority relating to the operation and management of the Provider Defendant was vested entirely with the Management Defendants.

   **2.     The Fraudulent Ownership and Operation of Sedani Medical**

17

86.     In or about early 2016, in order to disguise the volume of fraudulent billing emanating from the Singh Clinics, the Management Defendants recruited Sedani, a licensed physician who previously purported to provide many of the fraudulent services billed through NQ Medical. Like Basu before him, Sedani agreed to serve as the nominal or "paper" owner of Sedani Medical, which ostensibly was an unincorporated sole proprietorship medical practice, but actually was secretly and unlawfully owned and controlled by the Management Defendants.

87.     In order to circumvent New York law preventing non-medical professionals from owning and controlling medical professional corporations, the Management Defendants entered into a secret scheme with Sedani, wherein, in exchange for a designated salary or other form of compensation, Sedani agreed to falsely represent that he was the true shareholder, director, and officer of Sedani Medical and that he truly owned, controlled, and practiced through Sedani Medical.

88.     Sedani did this knowing that the unincorporated professional practice would be used to submit fraudulent billing to insurers.

89.     Once Sedani Medical was installed in the Singh Clinics, Sedani ceded true beneficial ownership and control over Sedani Medical to the Management Defendants.

90.     Sedani did not incur any costs to establish Sedani Medical's practice, nor did he invest any money in the medical practice he purportedly owned subsequent to the purchase of his medical license by the Management Defendants.

91.     Upon fraudulent formation, the Management Defendants caused Sedani Medical to commence operations from the Hempstead Tpke Clinic.

92.     The Management Defendants – rather than Sedani – provided all costs associated with establishing Sedani Medical in the Hempstead Tpke Clinic, and all investment in Sedani

Medical subsequent to the purchase of Sedani's medical license by the Management Defendants in late 2013.

93.     Sedani never was the true shareholder, director, or officer of Sedani Medical, and never had any true ownership interest in or control over the practice. True ownership and control over Sedani Medical always rested entirely with the Management Defendants, who used the façade of the Provider Defendants to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

94.     Sedani exercised little to no control over or ownership interest in the Provider Defendant.

95.     All decision-making authority relating to the operation and management of the Provider Defendant was vested entirely with the Management Defendants.

### 3.     The Fraudulent Incorporation and Operation of Rapapuncture

96.     Beginning in or about mid-2013, the Management Defendants recruited Rapaport, a licensed physician and pediatrician, who was willing to sell to the Management Defendants the use of his professional license, so that the Management Defendants could fraudulently incorporate Rapapuncture, in order to bill GEICO and other insurers for fraudulent acupuncture services at the Singh Clinics.

97.     In order to circumvent New York law preventing non-medical professionals from owning and controlling medical professional corporations, the Management Defendants entered into a secret scheme with Rapaport, wherein, in exchange for a designated salary or other form of compensation, Rapaport agreed to falsely represent in the certificate of incorporation and related

filings with New York State, that he was the true shareholder, director, and officer of Rapapuncture and that he truly owned, controlled, and practiced through the professional corporation.

98.    Rapaport did this knowing that the professional corporation would be used to submit fraudulent billing to insurers.

99.    Once Rapapuncture was fraudulently incorporated, Rapaport ceded true beneficial ownership and control over Rapapuncture to the Management Defendants.

100.    Rapaport did not incur any costs to establish Rapapuncture's practice, nor did he invest any money in the professional corporation he purportedly owned subsequent to the purchase of his professional license by the Management Defendants.

101.    Upon fraudulent incorporation, the Management Defendants caused Rapapuncture to commence operations from the Singh Clinics, two different multi-disciplinary no-fault clinics owned and/or controlled by the Management Defendants.

102.    The Management Defendants – rather than Rapaport – provided all costs associated with establishing Rapapuncture in the Singh Clinics, and all investment in Rapapuncture subsequent to the purchase of Rapaport's medical license by the Management Defendants in late 2013.

103.    Rapaport never was the true shareholder, director, or officer of Rapapuncture, and never had any true ownership interest in or control over any of the professional corporations. True ownership and control over Rapapuncture always rested entirely with the Management Defendants, who used the façade of the Provider Defendants to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

104.    Rapaport exercised little to no control over or ownership interest in the Provider Defendant.

105.    All decision-making authority relating to the operation and management of the Provider Defendant was vested entirely with the Management Defendants.

106.    In addition, Rapaport never controlled or maintained any of the Provider Defendant's books or records, including their bank accounts; never selected, directed, or controlled any of the individuals or entities responsible for handling any aspect of the Provider Defendants' financial affairs; never hired or supervised any of Provider Defendant's employees or independent contractors; and was completely unaware of fundamental aspects of how the Provider Defendant operated.

107.    In keeping with Rapaport's lack of control and ownership in Rapapuncture, at all relevant times, while the Management Defendants were operating Rapapuncture as a professional corporation purporting to provide legitimate acupuncture services, Rapaport was separately running a full-time pediatrics practice at another location.

### 4.    The Fraudulent Ownership and Operation of Bright Acupuncture

108.    In or about late 2015, in order to disguise the volume of fraudulent acupuncture billing emanating from the Singh Clinics, the Management Defendants recruited Bright, a licensed acupuncturist who previously purported to provide many of the fraudulent services billed through Rapapuncture. Like Rapaport before her, Bright agreed to serve as the nominal or "paper" owner of Bright Acupuncture, which ostensibly was an unincorporated sole proprietorship acupuncture practice, but actually was secretly and unlawfully owned and controlled by the Management Defendants.

109.    In order to circumvent New York law preventing non-medical professionals from owning and controlling medical professional corporations, the Management Defendants entered into a secret scheme with Bright, wherein, in exchange for a designated salary or other form of compensation, Bright agreed to falsely represent that she was the true shareholder, director, and officer of Bright Acupuncture and that she truly owned, controlled, and practiced through Bright Acupuncture.

110.    Bright did this knowing that the unincorporated professional practice would be used to submit fraudulent billing to insurers.

111.    Once Bright Acupuncture was installed in the Singh Clinics, Bright ceded true beneficial ownership and control over Bright Acupuncture to the Management Defendants.

112.    Bright did not incur any costs to establish Bright Acupuncture's practice, nor did she invest any money in the medical practice she purportedly owned subsequent to the purchase of her acupuncture license by the Management Defendants.

113.    Upon fraudulent formation, the Management Defendants caused Bright Acupuncture to commence operations from the Myrtle Ave Clinic.

114.    The Management Defendants – rather than Bright – provided all costs associated with establishing Bright Acupuncture in the Myrtle Ave Clinic, and all investment in Bright Acupuncture subsequent to the purchase of Bright's acupuncture license by the Management Defendants in late 2013.

115.    Bright never was the true shareholder, director, or officer of Bright Acupuncture, and never had any true ownership interest in the practice. True ownership and control over Bright Acupuncture always rested entirely with the Management Defendants, who used the façade of the Provider Defendants to do indirectly what they were forbidden from doing directly, namely: (i)

22

employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

116.   Bright exercised little to no control over or ownership interest in the Provider Defendant.

117.   All decision-making authority relating to the operation and management of the Provider Defendant was vested entirely with the Management Defendants.

### 5.   The Fraudulent Ownership and Operation of Choi Acupuncture

118.   In or about mid-2016, in order to further disguise the volume of fraudulent acupuncture billing emanating from the Singh Clinics, the Management Defendants recruited Choi, a licensed acupuncturist who was willing to sell to the Management Defendants the use of his professional license. Like Rapaport and Bright before him, Choi agreed to serve as the nominal or "paper" owner of Choi Acupuncture, which ostensibly was an unincorporated sole proprietorship acupuncture practice, but actually was secretly and unlawfully owned and controlled by the Management Defendants.

119.   In order to circumvent New York law preventing non-medical professionals from owning and controlling medical professional corporations, the Management Defendants entered into a secret scheme with Choi, wherein, in exchange for a designated salary or other form of compensation, Choi agreed to falsely represent that she was the true shareholder, director, and officer of Choi Acupuncture and that she truly owned, controlled, and practiced through Choi Acupuncture.

120.   Choi did this knowing that the unincorporated professional practice would be used to submit fraudulent billing to insurers.

121.    Once Choi Acupuncture was installed in the Singh Clinics, Choi ceded true beneficial ownership and control over Choi Acupuncture to the Management Defendants.

122.    Choi did not incur any costs to establish Choi Acupuncture's practice, nor did she invest any money in the medical practice she purportedly owned subsequent to the purchase of his acupuncture license by the Management Defendants.

123.    Upon fraudulent formation, the Management Defendants caused Choi Acupuncture to commence operations from the Hempstead Tpke Clinic.

124.    The Management Defendants – rather than Choi – provided all costs associated with establishing Choi Acupuncture in the Hempstead Tpke Clinic, and all investment in Choi Acupuncture subsequent to the purchase of Choi's acupuncture license by the Management Defendants in mid-2016.

125.    Choi never was the true shareholder, director, or officer of Choi Acupuncture, and never had any true ownership interest in the practice. True ownership and control over Choi Acupuncture always rested entirely with the Management Defendants, who used the façade of the Provider Defendants to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

126.    Choi exercised little to no control over or ownership interest in the Provider Defendant.

127.    All decision-making authority relating to the operation and management of the Provider Defendant was vested entirely with the Management Defendants.

**6.      The Fraudulent Incorporation and Operation of YC Acupuncture**

128.     Beginning in or about early 2017, in order to further disguise the volume of fraudulent acupuncture billing emanating from the Singh Clinics, the Management Defendants again approached Choi, a licensed acupuncturist, who was willing to sell to the Management Defendants the use of his professional license, so that the Management Defendants could fraudulently incorporate YC Acupuncture, in order to bill GEICO and other insurers for fraudulent acupuncture services at the Singh Clinics.

129.     In order to circumvent New York law preventing non-medical professionals from owning and controlling medical professional corporations, the Management Defendants entered into a secret scheme with Choi, wherein, in exchange for a designated salary or other form of compensation, Choi agreed to falsely represent in the certificate of incorporation and related filings with New York State, that he was the true shareholder, director, and officer of YC Acupuncture and that he truly owned, controlled, and practiced through the professional corporation.

130.     Choi did this knowing that the professional corporation would be used to submit fraudulent billing to insurers.

131.     Once YC Acupuncture was fraudulently incorporated, Choi ceded true beneficial ownership and control over YC Acupuncture to the Management Defendants.

132.     Choi did not incur any costs to establish YC Acupuncture's practice, nor did he invest any money in the professional corporation he purportedly owned subsequent to the purchase of his professional license by the Management Defendants.

133.     Upon fraudulent incorporation, the Management Defendants caused YC Acupuncture to commence operations from the Hempstead Tpke Clinic, a multi-disciplinary no-fault clinic owned and/or controlled by the Management Defendants.

134.    The Management Defendants – rather than Choi – provided all costs associated with establishing YC Acupuncture in the Hempstead Tpke Clinic, and all investment in YC Acupuncture subsequent to the purchase of Choi's medical license by the Management Defendants early 2017.

135.    Choi never was the true shareholder, director, or officer of YC Acupuncture, and never had any true ownership interest in or control over any of the professional corporations. True ownership and control over YC Acupuncture always rested entirely with the Management Defendants, who used the façade of the Provider Defendants to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

136.    Choi exercised little to no control over or ownership interest in the Provider Defendant.

137.    All decision-making authority relating to the operation and management of the Provider Defendant was vested entirely with the Management Defendants.

**7.      The Fraudulent Ownership and Operation of Aminova Acupuncture**

138.    In or about mid-2018, in order to further disguise the volume of fraudulent acupuncture billing emanating from the Singh Clinics, the Management Defendants recruited Aminova, a licensed acupuncturist who was willing to sell to the Management Defendants the use of her professional license. Like Rapaport, Bright, and Choi before her, Aminova agreed to serve as the nominal or "paper" owner of Aminova Acupuncture, which ostensibly was an unincorporated sole proprietorship acupuncture practice, but actually was secretly and unlawfully owned and controlled by the Management Defendants.

139.    In order to circumvent New York law preventing non-medical professionals from owning and controlling medical professional corporations, the Management Defendants entered into a secret scheme with Aminova, wherein, in exchange for a designated salary or other form of compensation, Aminova agreed to falsely represent that she was the true shareholder, director, and officer of Aminova Acupuncture and that she truly owned, controlled, and practiced through Aminova Acupuncture.

140.    Aminova did this knowing that the unincorporated professional practice would be used to submit fraudulent billing to insurers.

141.    Once Aminova Acupuncture was installed in the Singh Clinics, Aminova ceded true beneficial ownership and control over Aminova Acupuncture to the Management Defendants.

142.    Aminova did not incur any costs to establish Aminova Acupuncture's practice, nor did she invest any money in the medical practice she purportedly owned subsequent to the purchase of her acupuncture license by the Management Defendants.

143.    Upon fraudulent formation, the Management Defendants caused Aminova Acupuncture to commence operations from the Hempstead Tpke Clinic.

144.    The Management Defendants – rather than Aminova – provided all costs associated with establishing Aminova Acupuncture in the Hempstead Tpke Clinic, and all investment in Aminova Acupuncture subsequent to the purchase of Aminova's acupuncture license by the Management Defendants in late 2013.

145.    Aminova never was the true shareholder, director, or officer of Aminova Acupuncture, and never had any true ownership interest in the practice. True ownership and control over Aminova Acupuncture always rested entirely with the Management Defendants, who used the façade of the Provider Defendants to do indirectly what they were forbidden from doing

27

directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

146.    Aminova exercised little to no control over or ownership interest in the Provider Defendant.

147.    All decision-making authority relating to the operation and management of the Provider Defendant was vested entirely with the Management Defendants.

### 8.    The Fraudulent Incorporation and Operation of Good Care PT

148.    Beginning in or about late 2013, the Management Defendants recruited S. Kim, a licensed physical therapist, who was willing to sell to the Management Defendants the use of her professional license, so that the Management Defendants could fraudulently incorporate Good Care PT.

149.    In order to circumvent New York law preventing non-medical professionals from owning and controlling medical professional corporations, the Management Defendants entered into a secret scheme with S. Kim, wherein, in exchange for a designated salary or other form of compensation, S. Kim agreed to falsely represent in the certificate of incorporation and related filings with New York State, that she was the true shareholder, director, and officer of Good Care PT and that she truly owned, controlled, and practiced through the professional corporation.

150.    S. Kim did this knowing that the professional corporation would be used to submit fraudulent billing to insurers.

151.    Once Good Care PT was fraudulently incorporated, S. Kim ceded true beneficial ownership and control over Good Care PT to the Management Defendants.

152.    S. Kim did not incur any costs to establish Good Care PT's practice, nor did she invest any money in the professional corporation she purportedly owned subsequent to the purchase of her physical therapy license by the Management Defendants.

153.    Upon fraudulent incorporation, the Management Defendants caused the Provider Defendants to commence operations from the Hempstead Tpke Clinic, a multi-disciplinary no-fault clinic owned and/or controlled by the Management Defendants.

154.    The Management Defendants – rather than S. Kim – provided all costs associated with establishing Good Care PT in the Hempstead Tpke Clinic, and all investment in Good Care PT subsequent to the purchase of S. Kim's physical therapy license by the Management Defendants in late 2013.

155.    S. Kim never was the true shareholder, director, or officer of Good Care PT, and never had any true ownership interest in or control over any of the professional corporations. True ownership and control over Good Care PT always rested entirely with the Management Defendants, who used the façade of the Provider Defendants to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

156.    S. Kim exercised little to no control over or ownership interest in the Provider Defendant.

157.    All decision-making authority relating to the operation and management of the Provider Defendant was vested entirely with the Management Defendants.

**9.      The Fraudulent Incorporation and Operation of Evergreen PT**

158.    Beginning in or about mid-2017, in order to disguise the volume of fraudulent physical therapy billing emanating from the Singh Clinics, the Management Defendants recruited

29

H. Kim, a licensed physical therapist, who was willing to sell to the Management Defendants the use of her professional license, so that the Management Defendants could fraudulently incorporate Evergreen PT.

159.     In order to circumvent New York law preventing non-medical professionals from owning and controlling medical professional corporations, the Management Defendants entered into a secret scheme with H. Kim, wherein, in exchange for a designated salary or other form of compensation, H. Kim agreed to falsely represent in the certificate of incorporation and related filings with New York State, that she was the true shareholder, director, and officer of Evergreen PT and that she truly owned, controlled, and practiced through the professional corporation.

160.     H. Kim did this knowing that the professional corporation would be used to submit fraudulent billing to insurers.

161.     Once Evergreen PT was fraudulently incorporated, H. Kim ceded true beneficial ownership and control over Evergreen PT to the Management Defendants.

162.     H. Kim did not incur any costs to establish Evergreen PT's practice, nor did she invest any money in the professional corporation she purportedly owned subsequent to the purchase of her physical therapy license by the Management Defendants.

163.     Upon fraudulent incorporation, the Management Defendants caused the Provider Defendants to commence operations from the Hempstead Tpke Clinic, a multi-disciplinary no-fault clinic owned and/or controlled by the Management Defendants.

164.     The Management Defendants – rather than H. Kim – provided all costs associated with establishing Evergreen PT in the Hempstead Tpke Clinic, and all investment in Evergreen PT subsequent to the purchase of H. Kim's physical therapy license by the Management Defendants in late 2013.

165.    H. Kim never was the true shareholder, director, or officer of Evergreen PT, and never had any true ownership interest in or control over any of the professional corporations. True ownership and control over Evergreen PT always rested entirely with the Management Defendants, who used the façade of the Provider Defendants to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

166.    H. Kim exercised little to no control over or ownership interest in the Provider Defendant.

167.    All decision-making authority relating to the operation and management of the Provider Defendant was vested entirely with the Management Defendants.

### 10.    The Fraudulent Incorporation and Operation of ASAP Chiro

168.    Beginning in or about early 2014, the Management Defendants recruited Park**,** a licensed chiropractor, who was willing to sell to the Management Defendants the use of his professional license, so that the Management Defendants could fraudulently incorporate ASAP Chiro.

169.    In order to circumvent New York law preventing non-medical professionals from owning and controlling medical professional corporations, the Management Defendants entered into a secret scheme with Park, wherein, in exchange for a designated salary or other form of compensation, Park agreed to falsely represent in the certificate of incorporation and related filings with New York State, that she was the true shareholder, director, and officer of ASAP Chiro and that she truly owned, controlled, and practiced through the professional corporation.

170.    Park did this knowing that the professional corporation would be used to submit fraudulent billing to insurers.

171.   Once ASAP Chiro was fraudulently incorporated, Park ceded true beneficial ownership and control over ASAP Chiro to the Management Defendants.

172.   Park did not incur any costs to establish ASAP Chiro's practice, nor did she invest any money in the professional corporation she purportedly owned subsequent to the purchase of his chiropractic license by the Management Defendants.

173.   Upon fraudulent incorporation, the Management Defendants caused the Provider Defendants to commence operations from the Hempstead Tpke Clinic, a multi-disciplinary no-fault clinic owned and/or controlled by the Management Defendants.

174.   The Management Defendants – rather than Park – provided all costs associated with establishing ASAP Chiro in the Hempstead Tpke Clinic, and all investment in ASAP Chiro subsequent to the purchase of Park's chiropractic license by the Management Defendants in 2014.

175.   Park never was the true shareholder, director, or officer of ASAP Chiro, and never had any true ownership interest in or control over any of the professional corporations. True ownership and control over ASAP Chiro always rested entirely with the Management Defendants, who used the façade of the Provider Defendants to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

176.   Park exercised little to no control over or ownership interest in the Provider Defendant.

177.   All decision-making authority relating to the operation and management of the Provider Defendant was vested entirely with the Management Defendants.

**11.     The Fraudulent Incorporation and Operation of Four Seasons Chiro**

178.    Beginning in or about mid-2017, the Management Defendants recruited Lee**,** a licensed chiropractor, who was willing to sell to the Management Defendants the use of his professional license, so that the Management Defendants could fraudulently incorporate Four Seasons Chiro.

179.    In order to circumvent New York law preventing non-medical professionals from owning and controlling medical professional corporations, the Management Defendants entered into a secret scheme with Lee, wherein, in exchange for a designated salary or other form of compensation, Lee agreed to falsely represent in the certificate of incorporation and related filings with New York State, that she was the true shareholder, director, and officer of Four Seasons Chiro and that she truly owned, controlled, and practiced through the professional corporation.

180.    Lee did this knowing that the professional corporation would be used to submit fraudulent billing to insurers.

181.    Once Four Seasons Chiro was fraudulently incorporated, Lee ceded true beneficial ownership and control over Four Seasons Chiro to the Management Defendants.

182.    Lee did not incur any costs to establish Four Seasons Chiro's practice, nor did she invest any money in the professional corporation she purportedly owned subsequent to the purchase of his chiropractic license by the Management Defendants.

183.    Upon fraudulent incorporation, the Management Defendants caused the Provider Defendants to commence operations from the Hempstead Tpke Clinic, a multi-disciplinary no-fault clinic owned and/or controlled by the Management Defendants.

184.    The Management Defendants – rather than Lee – provided all costs associated with establishing Four Seasons Chiro in the Hempstead Tpke Clinic, and all investment in Four

Seasons Chiro subsequent to the purchase of Lee's chiropractic license by the Management Defendants in mid-2017.

185. Lee never was the true shareholder, director, or officer of Four Seasons Chiro, and never had any true ownership interest in or control over any of the professional corporations. True ownership and control over Four Seasons Chiro always rested entirely with the Management Defendants, who used the façade of the Provider Defendants to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

186. Lee exercised little to no control over or ownership interest in the Provider Defendant.

187. All decision-making authority relating to the operation and management of the Provider Defendant was vested entirely with the Management Defendants.

### 12. The Fraudulent Ownership and Operation of Kimmel Chiro

188. In or about late 2013, in order to further disguise the volume of fraudulent chiropractic billing emanating from the Singh Clinics, the Management Defendants recruited Kimmel, a licensed chiropractor who was willing to sell to the Management Defendants the use of him professional license. Kimmel agreed to serve as the nominal or "paper" owner of Kimmel Chiropractic, which ostensibly was an unincorporated sole proprietorship chiropractic practice, but actually was secretly and unlawfully owned and controlled by the Management Defendants.

189. In order to circumvent New York law preventing non-medical professionals from owning and controlling medical professional corporations, the Management Defendants entered into a secret scheme with Kimmel, wherein, in exchange for a designated salary or other form of compensation, Kimmel agreed to falsely represent that he was the true shareholder, director, and

officer of Kimmel Chiropractic and that he truly owned, controlled, and practiced through Kimmel Chiropractic.

190. Kimmel did this knowing that the unincorporated professional practice would be used to submit fraudulent billing to insurers.

191. Once Kimmel Chiropractic was installed in the Myrtle Ave Clinic, Kimmel ceded true beneficial ownership and control over Kimmel Chiropractic to the Management Defendants.

192. Kimmel did not incur any costs to establish Kimmel Chiropractic's practice, nor did he invest any money in the medical practice he purportedly owned subsequent to the purchase of his chiropractic license by the Management Defendants.

193. Upon fraudulent formation, the Management Defendants caused Kimmel Chiropractic to commence operations from the Hempstead Tpke Clinic.

194. The Management Defendants – rather than Kimmel – provided all costs associated with establishing Kimmel Chiropractic in the Hempstead Tpke Clinic, and all investment in Kimmel Chiropractic subsequent to the purchase of Kimmel's chiropractic license by the Management Defendants in late 2013.

195. Kimmel never was the true shareholder, director, or officer of Kimmel Chiropractic, and never had any true ownership interest in the practice. True ownership and control over Kimmel Chiropractic always rested entirely with the Management Defendants, who used the façade of the Provider Defendants to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

196. Kimmel exercised little to no control over or ownership interest in the Provider Defendant.

197.   All decision-making authority relating to the operation and management of the Provider Defendant was vested entirely with the Management Defendants.

**B.   The Management Defendants' Efforts to Conceal their Ownership and Control of the Provider Defendants**

198.   To conceal their true ownership and control of the Provider Defendants while simultaneously effectuating pervasive, total control over their operation and management, the Management Defendants arranged to have the Nominal Owner Defendants and the Provider Defendants enter into a series of "lease," "management," "billing," and/or "marketing" agreements with themselves and entities they own or control, including other medical professional corporations.  These agreements called for exorbitant payments from the Provider Defendants to the Management Defendants and for the performance of certain designated services including leasing, management, marketing, billing, and/or collections, regardless of the actual value of the services or space provided.

199.   While these agreements ostensibly were created to permit the Management Defendants to provide "facility space," "equipment," "management," "billing," and/or "marketing" services, they actually were used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own the Provider Defendants; and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through the Provider Defendants.

200.   In certain instances, these agreements required the Nominal Owner Defendants and the Provider Defendants to pay fees to other medical professional corporations that were also unlawfully owned and controlled by the Management Defendants.

201.   In certain instances, the Nominal Owner Defendants and the Provider Defendants were required—as a condition of operating from the Singh Clinics—to enter into various other

agreements with the Management Defendants for services such as office management and reception.

202.   Additionally, Singh caused several of the Provider Defendants to pay monies to Davleen Kaur, a relative of Singh, disguised as legitimate fees for billing services. In actuality, these payments for purported billing services were designed to siphon money from the Provider Defendants to Singh and the Management Defendants and disguise the Managements' ownership and control of the Provider Defendants.

203.   The net effect of these "lease," "management," "billing," and/or "marketing," agreements amongst the Nominal Owner Defendants, the Provider Defendants, and the Management Defendants was to maintain the Provider Defendants in a constant state of debt to the Management Defendants, thereby enabling the Management Defendants to maintain total control over the professional corporations, their accounts receivables, and any revenues that might be generated therefrom.

204.   To further conceal their ownership of the Provider Defendants, the Management Defendants arranged to have Basu appear, on paper, as a 50% owner of Management Defendant Millennium Health.

205.   In actuality, Millennium Health was at all times owned and controlled entirely by Singh and John Doe Defendants 1-5.

206.   By mispresenting Basu's relationship with Millennium Health, Singh and the Management Defendants sought to legitimize the exorbitant payments made by the Provider Defendants to Millennium Health, and obscure the fact that the Provider Defendants were sharing fees with unlicensed medical professionals, e.g., Singh.

207.    In actuality, the Provider Defendants were paying monies to Millennium Health—disguised as legitimate fees for rent, management, and other services—to hide the fact that Singh and John Doe Defendants 1-5 unlawfully owned and controlled the Provider Defendants.

208.    In keeping with Basu's lack of ownership and control over Millennium Health, Basu has never had access to Millennium Health's corporate bank accounts or records.

209.    In further keeping with Basu's lack of ownership and control over Millennium Health, at an examination under oath conducted by GEICO, Basu repeatedly referred to Millennium Health as Singh's company.

### C.    The Defendants' Fraudulent Treatment and Billing Protocol

210.    Virtually all of the Insureds whom the Defendants purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all. Concomitantly, virtually none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

211.    Even so, the Defendants purported to subject virtually every Insured to a substantially identical, medically unnecessary course of "treatment" that was provided pursuant to predetermined, fraudulent protocols designed to maximize the billing that they could submit through the Provider Defendants to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to it.

212.    The Defendants purported to provide their predetermined fraudulent treatment protocols to Insureds without regard for the Insureds' individual symptoms, presentation, or – in most cases – the total absence of any actual medical problems arising from any actual automobile accidents.

213.    Each step in the Defendants' fraudulent treatment protocols was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

214.    No legitimate healthcare provider exercising genuine medical judgment would permit the fraudulent treatment and billing protocols described below to proceed under his or her auspices.

215.    The Defendants permitted the fraudulent treatment and billing protocols described below to proceed under their auspices because the Defendants sought to profit from the fraudulent billing submitted to GEICO and other insurers.

**1.      The Fraudulent Charges for Initial Examinations**

216.    Upon receiving an illegal referral from the Management Defendants at the Singh Clinics, the Provider Defendants purported to provide virtually every Insured in the claims identified in Exhibits "1" - "2" with an initial examination.

217.    The initial examinations were performed as a "gateway" in order to provide Insureds with phony, predetermined "diagnoses" to allow the Defendants to then purport to provide medically unnecessary, illusory, or otherwise non-reimbursable electrodiagnostic testing, computerized range of motion and muscle strength testing, physical performance testing, physical therapy, chiropractic treatment, and acupuncture.

218.    Typically, either Basu or Sedani purported to perform the initial examinations on behalf of NQ Medical or Sedani Medical.

219.    As set forth in Exhibits "1" - "2", the initial examinations were then typically billed to GEICO through the Provider Defendants under CPT code 99205, 99204, or 99203, typically resulting in charges between $104.07 and $200.68.

220.    The charges for the initial examinations were fraudulent in that the initial examinations were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to illegal referrals from the Management Defendants at the Singh Clinics, not to treat or otherwise benefit the Insureds.

221.    Furthermore, pursuant to the NY Fee Schedule, when the Defendants submitted charges for initial examinations under CPT code 99205, or caused them to be submitted, they represented that a physician associated with the Provider Defendants: (i) performed a "comprehensive" physical examination; and (ii) engaged in medical decision-making of "high complexity".

222.    Similarly, pursuant to the NY Fee Schedule, when the Defendants submitted charges for initial examinations under CPT code 99204, or caused them to be submitted, they represented that a physician associated with the Provider Defendants: (i) performed a "comprehensive" physical examination; and (ii) engaged in medical decision-making of "moderate complexity".

223.    Additionally, pursuant to the NY Fee Schedule, when the Defendants submitted charges for initial examinations under CPT code 99203, or caused them to be submitted, they represented that a chiropractor associated with the Provider Defendants performed a "detailed" physical examination.

224.    As set forth below, however, the charges for the initial examinations were fraudulent in that they misrepresented the nature, extent, and results of the purported examinations.

**a.    Misrepresentations Regarding "Comprehensive" or "Detailed" Physical Examinations**

225.    Pursuant to the American Medical Association's CPT Assistant, which is incorporated by reference into the NY Fee Schedule, a physical examination does not qualify as "comprehensive" unless the examining physician either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

226.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a general examination of multiple patient organ systems unless the physician has documented findings with respect to at least eight organ systems.

227.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)      at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)     the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)     palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)      examination of gait and station;

(vi)   examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)   coordination, deep tendon reflexes, and sensation; and

(ix)   mental status, including orientation to time, place and person, as well as mood and affect.

228.   In the claims identified in Exhibits "1" – "2", when the Provider Defendants and Nominal Owner Defendants billed for the initial examinations under CPT code 99205 or 99204, they falsely represented that physicians associated with the Provider Defendants performed "comprehensive" patient examinations on the Insureds they purported to treat during the initial examinations.

229.   In fact, with respect to the claims identified in Exhibit "1" – "2", neither Basu, Sedani, nor any other healthcare services provider associated with the Provider Defendants ever conducted a general examination of multiple patient organ systems, or conducted a complete examination of a single patient organ system.

230.   For instance, in each of the claims under CPT code 99205 or 99204 identified in Exhibits "1" – "2", neither Basu, Sedani, nor any other healthcare services provider associated with the Provider Defendants ever conducted any general examination of multiple patient organ systems, inasmuch as they did not document findings with respect to at least eight organ systems.

231.   Furthermore, although Basu and Sedani often purported to provide a more in-depth examination of the Insureds' musculoskeletal systems in the claims for initial examinations

identified in Exhibits "1" – "2", the musculoskeletal examinations did not qualify as "complete", because they failed to document:

(i)     at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)     examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)  coordination, deep tendon reflexes, and sensation; and/or

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

232.    Pursuant to the CPT Assistant, a "detailed" physical examination requires – among other things – that the healthcare services provider conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

233.    To the extent that the Insureds in the claims identified in Exhibits "1" - "2" had any actual complaints at all as the result of their minor automobile accidents, the complaints were limited to minor musculoskeletal complaints.

234. Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted an extended examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to the following:

(i) measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii) general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii) examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv) palpation of lymph nodes in neck, axillae, groin and/or other location;

(v) brief assessment of mental status;

(vi) examination of gait and station;

(vii) inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii) coordination;

(ix) examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x) examination of sensation.

235. In the claims for initial examinations in Exhibits "1" - "2" in which the Provider Defendants, Nominal Owner Defendants, and the Management Defendants billed for the initial examinations under CPT code 99203, they falsely represented that Basu, Sedani, or some other healthcare provider associated with the Provider Defendants conducted a "detailed" patient examination of the Insureds they purported to treat during the initial examinations.

236.     In fact, neither Basu, Sedani, nor any other healthcare services provider associated with the Provider Defendants even conducted a "detailed" patient examination of the Insureds, inasmuch as they did not conduct an extended examination of the Insureds' affected body areas and other symptomatic or related organ systems.

237.     For example, in the claims for initial examinations identified in Exhibits "1" - "2", neither Basu, Sedani, nor any other healthcare services provider associated with the Provider Defendants ever conducted an extended examination of the Insureds' musculoskeletal systems, inasmuch as they did not document findings with respect to the following:

(i)      measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)     general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)    examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)     palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)      brief assessment of mental status;

(vi)     examination of gait and station;

(vii)    inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)   coordination;

(ix)     examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and/or

(x)      examination of sensation.

238.    In the claims for initial examinations under CPT codes 99205, 99204, and 99203 99203 that are identified in Exhibits "1" - "2", the Provider Defendants and Nominal Owner Defendants, falsely represented that they had provided "detailed" or "comprehensive" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT codes 99205, 99204, and 99203, because examinations billable under CPT codes 99205, 99204, and 999203 are reimbursable at higher rates than examinations that do not require the examining physician to provide "detailed" or "comprehensive" physical examinations.

**b.    Misrepresentations Regarding the Extent of Medical Decision-Making**

239.    In addition, when the Provider Defendants submitted charges for initial examinations under CPT codes 99205 or 99204, they represented that Basu, Sedani, or some other healthcare provider associated with the Provider Defendants engaged in medical decision-making of "high complexity" or "moderate complexity."

240.    Pursuant to the CPT Assistant, which is incorporated by reference into the NY Fee Schedule, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

241.    The CPT Assistant provides various clinical examples of the types of presenting problems that might require highly complex medical decision-making, and thereby justify the use of CPT code 99205 to bill for an initial patient examination. Specifically:

(i)    Initial office evaluation of a 65-year-old female with exertional chest pain, intermittent claudication, syncope and a murmur of aortic stenosis. (Cardiology)

(ii)     Initial outpatient evaluation of a 69-year-old male with severe chronic obstructive pulmonary disease, congestive heart failure, anti hypertension. (Family Medicine)

(iii)    Initial office visit for a 73-year-old male with an unexplained 20-pound weight loss. (Hematology/Oncology)

(iv)    Initial office visit for a 24-year-old homosexual male who has a fever, a cough, and shortness of breath. (Infectious Disease)

(v)     Initial office evaluation, patient with systemic lupus erythematosus, fever, seizures and profound thrombocytopenia. (Rheumatology)

(vi)    Initial office evaluation and management of patient with systemic vasculitis and compromised circulation to the limbs. (Rheumatology)

242.    The CPT Assistant provides various clinical examples of the types of presenting problems that might require moderately complex medical decision-making, and thereby justify the use of CPT code 99204 to bill for an initial patient examination. Specifically:

(i)     Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii)    Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii)   Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv)    Initial office visit for 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v)     Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi)    Initial office evaluation of 70-year-old female with polyarthralgia. (Rheumatology)

(vii)   Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

243.    Accordingly, pursuant to the CPT Assistant, the types of presenting problems that might legitimately require highly or moderately complex medical decision-making, and thereby

support the use of CPT code 99205 or 99204 to bill for an initial patient examination, typically are problems that pose a serious threat to the patient's health, or even the patient's life.

244.     By contrast, to the limited extent that the Insureds in the claims identified in Exhibits "1" - "2" had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were low severity soft tissue injuries such as sprains and strains at the outset.

245.     What is more, by the time the Insureds in the claims identified in Exhibits "1" - "2" presented to the Provider Defendants for the putative initial examinations – typically weeks or even months after their accidents – the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or their presenting problems were minimal.

246.     Though the Provider Defendants, Basu, and Sedani routinely falsely represented that their initial examinations involved medical decision-making of "high complexity" (when billed under CPT code 99205) or "moderate complexity" (when billed under CPT code 99204), in actuality the initial examinations did not involve any medical decision-making at all.

247.     First, in virtually every case, the initial examinations did not involve the retrieval, review, or analysis of any medical records, diagnostic tests, or other information.

248.     When the Insureds presented to the Provider Defendants for treatment, they did not arrive with any medical records. Furthermore, prior to the initial examinations, the Defendants neither requested any medical records from any other providers, nor provided any diagnostic tests.

249. Second, in virtually every case, there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

250. Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the Provider Defendants, to the extent that they provided any such diagnostic procedures or treatment options in the first instance.

251. In almost every instance, any diagnostic procedures and "treatments" that the Provider Defendants, Basu, and Sedani actually provided were limited to a series of basic, medically unnecessary range of motion tests, muscle strength tests, neurological tests, and physical therapy, none of which was health- or life-threatening if properly administered.

252. Third, in virtually every case, neither Basu, Sedani, nor any other healthcare services provider associated with the Provider Defendants ever considered any significant number of diagnoses or treatment options for Insureds during the initial examinations.

253. Rather, to the extent that the initial examinations were conducted in the first instance, the Provider Defendants provided a nearly identical, predetermined "diagnosis" for every Insured, and prescribed a virtually identical course of treatment for every Insured.

254. Specifically, in almost every instance, during the initial examinations the Insureds did not report any medical problems that legitimately could be traced to an underlying automobile accident.

255. Even so, the Provider Defendants prepared initial examination reports in which they provided phony, boilerplate sprain/strain and similar, objectively unverifiable soft tissue

injury "diagnoses" to virtually every Insured, regardless of their individual circumstances or presentation.

256.    Then, based upon these supposed "diagnoses", the Provider Defendants, Basu, and Sedani directed Insureds to receive a litany of medically unnecessary services, including electrodiagnostic testing, computerized range of motion and muscle strength testing, physical performance testing, physical therapy, chiropractic treatment, and acupuncture.

257.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

258.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

259.    As set forth above, in the claims identified in Exhibits "1" - "2", virtually all of the Insureds whom the Provider Defendants, Basu, and Sedani purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

260.    It is extremely improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibits "1" - "2" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

261.    It is even more improbable – to the point of impossibility – that this would occur repeatedly, often with the Insureds presenting at the Provider Defendants with substantially identical injuries on the exact same dates after their accidents.

262.    Even so, in keeping with the fact that the Provider Defendants, Basu, and Sedani's

putative "diagnoses" were phony, and in keeping with the fact that the putative initial examinations involved no actual medical decision-making at all, the Provider Defendants, Basu, and Sedani frequently issued substantially identical "diagnoses", on the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds.

263.    For example:

(i)    On November 28, 2015, two Insureds – A.A. and J.A. – were involved in the same automobile accident. AA and JA presented   on the exact same date, December 1, 2015, to NQ Medical for an initial examination performed by Basu pursuant to a referral from Singh and the Management Defendants at the Myrtle Ave Clinic. AA and JA were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that AA and JA suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Basu – at the Management Defendants' direction – provided AA and JA with substantially identical, phony "diagnoses," and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(ii)    On August 7, 2016, two Insureds – B.S. and L.A. – were involved in the same automobile accident. BA and LA presented  on the exact same date, August 23, 2016, to NQ Medical for an initial examination performed by Basu pursuant to a referral from Singh and the Management Defendants at the Myrtle Ave Clinic. BA and LA were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that BA and LA suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Basu – at the Management Defendants' direction – provided BA and LA with substantially identical, phony "diagnoses," and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(iii)    On August 10, 2019, two Insureds – L.M. and O.C. – were involved in the same automobile accident. LM and OC presented, nearly two months later, on the exact same date, October 7, 2019, to NQ Medical for an initial examination performed by Basu pursuant to a referral from Singh and the Management Defendants at the Hempstead Tpke Clinic. LM and OC were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that LM and OC suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Basu – at the Management Defendants' direction – provided LM

and OC with substantially identical, phony "diagnoses," and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(iv)     On November 2, 2018, two Insureds – A.A. and C.J. – were involved in the same automobile accident. AA and CJ presented, on the exact same date, November 19, 2018, to NQ Medical for an initial examination performed by Basu pursuant to a referral from Singh and the Management Defendants at the Myrtle Ave Clinic. AA and CJ were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that AA and CJ suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Basu – at the Management Defendants' direction – provided AA and CJ with substantially identical, phony "diagnoses," and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(v)      On January 4, 2019, two Insureds – W.G. and L.D. – were involved in the same automobile accident. WG and LD presented, on the exact same date, January 17, 2019, to NQ Medical for an initial examination performed by Basu pursuant to a referral from Singh and the Management Defendants at the Hempstead Tpke Clinic. WG and LD were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that WG and LD suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Basu – at the Management Defendants' direction – provided WG and LD with substantially identical, phony "diagnoses," and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(vi)     On March 29, 2019, two Insureds – A.H. and J.S. – were involved in the same automobile accident. AH and JS presented, on the exact same date, April 1, 2019, to NQ Medical for an initial examination performed by Basu pursuant to a referral from Singh and the Management Defendants at the Hempstead Tpke Clinic. AH and JS were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that AH and JS suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Basu – at the Management Defendants' direction – provided AH and JS with substantially identical, phony "diagnoses," and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(vii)    On July 16, 2016, two Insureds – R.L. and S.L.– were involved in the same automobile accident. RL and SL presented, nearly three months later, on the exact same date, October 7, 2016, to Sedani Medical for an initial examination performed by Sedani pursuant to a referral from Singh and the Management Defendants at the Hempstead Tpke Clinic. RL and SL were different ages, in different physical condition, and experienced the impact from different locations

in the vehicle. To the extent that RL and SL suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Basu – at the Management Defendants' direction – provided RL and SL with substantially identical, phony "diagnoses," and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(viii)   On February 11, 2017, two Insureds – S.C. and R.M. – were involved in the same automobile accident. SC and RM presented, two months later, on the exact same date, April 11, 2017, to Sedani Medical for an initial examination performed by Sedani pursuant to a referral from Singh and the Management Defendants at the Hempstead Tpke Clinic. SC and RM were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that SC and RM suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Basu – at the Management Defendants' direction – provided SC and RM with substantially identical, phony "diagnoses," and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(ix)   On April 15, 2017, two Insureds – J.T. and C.R. – were involved in the same automobile accident. JT and CR presented, two months later, on the exact same date, June 15, 2017, to Sedani Medical for an initial examination performed by Sedani pursuant to a referral from Singh and the Management Defendants at the Hempstead Tpke Clinic. JT and CR were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that JT and CR suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Basu – at the Management Defendants' direction – provided JT and CR with substantially identical, phony "diagnoses," and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(x)   On August 15, 2016, two Insureds – A.A. and J.A. – were involved in the same automobile accident. AA and JA presented, more than three months later, on the exact same date, November 18, 2016, to Sedani Medical for an initial examination performed by Sedani pursuant to a referral from Singh and the Management Defendants at the Hempstead Tpke Clinic. AA and JA were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that AA and JA suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Basu – at the Management Defendants' direction – provided AA and JA with substantially identical, phony "diagnoses," and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(xi)    On September 25, 2018, two Insureds – N.D. and D.H. – were involved in the same automobile accident. ND and DH presented, <u>on the exact same date</u>, October 1, 2018, to Sedani Medical for an initial examination performed by Sedani pursuant to a referral from Singh and the Management Defendants at the Hempstead Tpke Clinic. ND and DH were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that ND and DH suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Basu – at the Management Defendants' direction – provided ND and DH with substantially identical, phony "diagnoses," and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(xii)    On September 22, 2016, three Insureds – M.D., J.D., and F.D. – were involved in the same automobile accident. MD, JD, and FD presented, <u>on the exact same date</u>, September 26, 2016, to Sedani Medical for an initial examination performed by Sedani pursuant to a referral from Singh and the Management Defendants at the Hempstead Tpke Clinic. MD, JD, and FD were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that MD, JD, and FD suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Basu – at the Management Defendants' direction – provided MD, JD, and FD with substantially identical, phony "diagnoses," and recommended a substantially identical course of medically unnecessary "treatment" for all of them.

264.    These are only representative examples. In the claims for initial examinations that are identified in Exhibits "1" - "2", the Provider Defendants, Basu, and Sedani frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that the Insureds were differently situated.

265.    The Provider Defendants, Basu, and Sedani routinely inserted these false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

266.    In the claims for initial examinations identified in Exhibits "1" - "2", the Provider Defendants, Basu, and Sedani routinely falsely represented that the initial examinations involved "high complexity" or "moderate complexity" medical decision-making in order to provide a false basis to bill for the initial examinations under CPT codes 99205 and 99204, because examinations billable under CPT codes 99205 and 99204 are reimbursable at a higher rate than examinations that do not require any highly or moderately complex medical decision-making at all.

## 2.    The Fraudulent Charges for Follow-Up Examinations

267.    In addition to the fraudulent initial examinations, the Management Defendants, Provider Defendants, Basu, and Sedani typically purported to subject Insureds to one or more fraudulent follow-up examinations during the course of the Defendants' fraudulent treatment protocol.

268.    Basu or Sedani purported to personally perform virtually all of the follow-up examinations in the claims identified in Exhibits "1" and "2".

269.    The Management Defendants, Provider Defendants, Basu, and Sedani then virtually always billed the follow-up examinations to GEICO, or caused them to be billed to GEICO, under CPT code 99215, 99214, and 99213, typically resulting in charges between $114.33 and $148.69 for each follow-up examination they purported to perform and/or provide.

270.    The charges for the follow-up examinations were fraudulent in that they misrepresented the Provider Defendants' eligibility to bill for or to collect No-Fault Benefits in the first instance. In fact, the Provider Defendants never were eligible to bill for or to collect No-Fault Benefits, because they were unlawfully owned and controlled by the Management Defendants in contravention of New York law.

271.    The charges for the follow-up examinations also were fraudulent in that the follow-up examinations were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to fraudulent predetermined treatment protocols, not to treat or otherwise benefit the Insureds.

272.    Furthermore, the charges for the follow-up examinations were fraudulent in that they misrepresented the extent, nature, and results of the follow-up examinations.

273.    Pursuant to the CPT Assistant, the use of CPT codes 99215 or 99214 to bill for a follow-up examination typically requires that the patient present with problems of moderate to high severity.

274.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT codes 99215 and 99214 to bill for a follow-up patient examination. For example

(i)    Office visit with 30-year-old male, established patient 3 month history of fatigue, weight loss, intermittent fever, and presenting with diffuse adenopathy and splenomegaly. (Family Medicine)

(ii)    Office evaluation and discussion of treatment options for a 68-year-old male with a biopsy-proven rectal carcinoma. (General Surgery)

(iii)    Office visit for restaging of an established patient with new lymphadenopathy one year post therapy for lymphoma. (Hematology/Oncology)

(iv)    Follow-up office visit for a 65-year-old male with a fever of recent onset while on outpatient antibiotic therapy for endocarditis. (Infectious Disease)

(v)    Office visit for evaluation of recent onset syncopal attacks in a 70-year-old woman, established patient (Internal Medicine)

(vi)    Follow-up office visit for a 75-year-old patient with ALS (amyotropfuc lateral sclerosis), who is no longer able to swallow. (Neurology)

(vii)    Follow-up visit, 40-year-old mother of 3, with acute rheumatoid arthritis, anatomical Stage 3, ARA function Class 3 rheumatoid arthritis, and deteriorating function. (Rheumatology)

275.     Thus, the sort of presenting problems that justify a charge under CPT code 99215 or 99214 typically are problems that pose a serious threat to the patient's health, or even the patient's life.

276.     Pursuant to the Fee Schedule, the use of CPT code 99213 to bill for a follow-up examination represents that the Insured presented with problems of low-to-moderate severity.

277.     The CPT Assistant provides various clinical examples of the types of presenting problems that might qualify as problems of low-to-moderate severity, and thereby justify the use of CPT code 99213 to bill for a follow-up patient examination. Specifically:

(i)      Follow-up visit with 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii)     Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii)    Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv)     Routine, follow-up office evaluation at a three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v)      Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)     Quarterly follow-up office visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)    Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

278.     Accordingly, pursuant to the CPT Assistant, even the low-to-moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some real threat to the patient's health.

279.     By contrast, and as set forth above, to the limited extent that the Insureds in the claims identified in Exhibits "1" and "2" suffered any injuries at all in their minor automobile accidents, the injuries were garden-variety soft tissue injuries such as sprains and strains, which were not severe at all.

280.     For instance, and as set forth above, in virtually every case the Insureds who presented to the Provider Defendants for treatment were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

281.     To the limited extent that the Insureds were treated at any hospital following their accidents, they virtually always briefly were observed on an outpatient basis and then sent on their way with – at most – a minor sprain or strain diagnosis.

282.     Ordinary strains and sprains virtually always resolve after a short course of conservative treatment, or no treatment at all.

283.     Accordingly, by the time the Insureds in the claims identified in Exhibits "1" and "2" presented to NQ Medical or Sedani Medical for follow-up examinations – typically weeks or months after their minor accidents – they either had no continuing injuries at all as the result of their minor accidents, or their presenting problems were minimal.

284.     In the claims for follow-up examinations identified in Exhibits "1" and "2", Management Defendants, Provider Defendants, Basu, and Sedani falsely represented that the Insureds presented with problems of low-to-moderate (when billed under CPT code 99213) or moderate-to-high severity (when billed under CPT codes 99215 or 99214) in order to create a false basis for their charges, because follow-up examinations billable under CPT codes 99215, 99214, and 99213 are reimbursable at higher rates than examinations involving presenting problems of minimal severity.

285.     In the claims for follow-up examinations identified in Exhibits "1" and "2", the Management Defendants, Provider Defendants, Basu, and Sedani also falsely represented that the Insureds presented with problems of exaggerated severity in order to create the false appearance that the Insureds continued to suffer from injuries sustained in automobile accidents, and thereby create a false basis for the other Fraudulent Services the Defendants purported to provide, including medically-unnecessary physical therapy, chiropractic, and acupuncture.

286.     What is more, and pursuant to the Fee Schedule, the use of CPT codes 99215, 99214, and 99213 to bill for a follow-up patient examination typically requires that the examining physician, nurse practitioner, or physician assistant spend at least 40, 25, or 15 minutes, respectively, of face-to-face time with the Insured or the Insured's family during the examination.

287.     Though the Management Defendants, Provider Defendants, Basu, and Sedani billed for their putative follow-up examinations using CPT codes, 99215, 99214, and 99213, neither Basu, Sedani, nor any other physician, physician assistant, or nurse practitioner associated with NQ Medical or Sedani MEdical, ever spent 15 minutes of face-to-face time with the Insureds or their families in the follow-up examinations identified in Exhibits "1" and "2".

288.     Rather, the follow-up examinations in the claims identified in Exhibits "1" and "2" rarely lasted more than five minutes, to the extent that they were conducted at all.

289.     In keeping with the fact that the follow-up examinations in the claims identified in Exhibits "1" and "2" rarely lasted more than five minutes, to the extent that they were conducted at all, the Provider Defendants, Basu, and Sedani used boilerplate checklist forms in documenting the follow-up examinations, setting forth a very limited range of potential patient

complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

290.    All that was required to complete the boilerplate forms was a brief patient interview and a brief physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, basic range of motion and muscle strength testing, and basic neurological testing.

291.    These interviews and examinations did not require any physician or nurse practitioner associated with the Provider Defendants to spend more than five minutes of face-to-face time with the Insureds or their families, let alone 15, 25, or 40 minutes.

292.    What is more – and in keeping with the fact that NQ Medical and Sedani Medical were both unlawfully owned and controlled by the Management Defendants – both Provider Defendants, Basu, and Sedani utilized the same boilerplate checklist examination forms.

293.    In the claims for follow-up examinations identified in Exhibits "1" and "2", the Defendants routinely falsely represented that the examinations involved 15 minutes or more of face-to-face time between the examining physicians and the Insureds or the Insureds' families in order to create a false basis to bill for the examinations under CPT codes 99215, 99214, and 99213, because follow-up examinations billable under CPT codes 99215, 99214, and 99213 are reimbursable at higher rates than examinations that require less time to perform.

294.    Furthermore, pursuant to the Fee Schedule, when the Defendants billed for their putative follow-up examinations under CPT code 99213, they represented that Basu or Sedani performed at least two of the following three components during the putative follow-up examinations: (i) took an "expanded problem focused" patient history; (ii) conducted an "expanded problem focused" physical examination; and (iii) engaged in medical decision-

making of "low complexity".

295.    In actuality, however, in the claims for follow-up examinations identified in Exhibits "1" and "2", no treating physician associated with the Provider Defendants took any legitimate patient histories, conducted any legitimate physical examinations, or engaged in any legitimate medical decision-making at all.

296.    Rather, following their purported follow-up examinations, and at the direction of the Management Defendants, the treating physicians: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and (ii) referred the Insureds back to the Provider Defendants for medically-unnecessary physical therapy, chiropractic, and acupuncture.

297.    As set forth above, there are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

298.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

299.    What is more, even in the unlikely event that two Insureds suffered substantially identical injuries in a single automobile accident, their individual characteristics would determine whether, how, and to what extent their respective injuries resolved over time.

300.    It is improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibits "1" and "2" would suffer substantially identical injuries that continued to manifest themselves, in the same way, during contemporaneous follow-up examinations many weeks or even months after the underlying accidents.

301.    It is even more improbable – to the point of impossibility – that this would happen

over and over again.

302.    Even so, in keeping with the fact that the Defendants' putative follow-up examinations were phony, Basu and Sedani – at the direction of the Management Defendants – frequently falsely reported that two or more Insureds who were involved in the same underlying accident suffered substantially identical injuries that continued to manifest themselves, in the same way, during contemporaneous follow-up examinations weeks or even months after the underlying accidents.

303.    For example:

(i)    On November 28, 2015, two Insureds – A.A. and J.A. – were involved in the same minor automobile accident. AA and JA were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that AA and JA suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative follow-up examinations of AA and JA at Sedani Medical on January 12, 2016, Basu – at the direction of the Management Defendants – provided AA and JA with substantially identical, phony "diagnoses," despite the fact that they were differently situated.

(ii)   On February 19, 2016, two Insureds – I.M. and P.R. – were involved in the same minor automobile accident. IM and PR were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that IM and PR suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative follow-up examinations of IM and PR at Sedani Medical on October 4, 2016, Basu – at the direction of the Management Defendants – provided IM and PR with substantially identical, phony "diagnoses," despite the fact that they were differently situated.

(iii)  On August 1, 2017, two Insureds – C.R. and A.R. – were involved in the same minor automobile accident. CR and AR were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that CR and AR suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative follow-up examinations of CR and AR at Sedani Medical on September 5, 2017, Basu – at the direction of the Management Defendants – provided CR and AR with substantially identical, phony "diagnoses," despite the fact that they were differently situated.

(iv)    On December 8, 2014, two Insureds – G.F. and V.F. – were involved in the same minor automobile accident. GF and VF were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that GF and VF suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative follow-up examinations of GF and VF at Sedani Medical on June 16, 2015, Basu – at the direction of the Management Defendants – provided GF and VF with substantially identical, phony "diagnoses," despite the fact that they were differently situated.

(v)    On December 27, 2014, two Insureds – Y.S. and R.S. – were involved in the same minor automobile accident. YS and RS were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that YS and RS suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative follow-up examinations of YS and RS at Sedani Medical on February 26, 2015, Basu – at the direction of the Management Defendants – provided YS and RS with substantially identical, phony "diagnoses," despite the fact that they were differently situated.

(vi)    On June 19, 2018, two Insureds – A.W. and C.M. – were involved in the same minor automobile accident. AW and CM were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that AW and CM suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative follow-up examinations of AW and CM at Sedani Medical on August 21, 2018, Basu – at the direction of the Management Defendants – provided AW and CM with substantially identical, phony "diagnoses," despite the fact that they were differently situated.

(vii)    On May 22, 2016, two Insureds – M.M.and K.M.– were involved in the same minor automobile accident. MM and KM were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that MM and KM suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative follow-up examinations of MM and KM at Sedani Medical on September 26, 2016, Sedani – at the direction of the Management Defendants – provided MM and KM with substantially identical, phony "diagnoses," despite the fact that they were differently situated.

(viii)    On August 23, 2016, two Insureds – E.R.and D.F.– were involved in the same minor automobile accident. ER and DF were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that ER and DF suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so,

63

at the conclusion of putative follow-up examinations of ER and DF at Sedani Medical on October 20, 2016, Sedani – at the direction of the Management Defendants – provided ER and DF with substantially identical, phony "diagnoses," despite the fact that they were differently situated.

(ix)     On October 31, 2016, two Insureds – K.I. and Z.I.– were involved in the same minor automobile accident KI and ZI were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that KI and ZI suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative follow-up examinations of KI and ZI at Sedani Medical on December 13, 2016, Sedani – at the direction of the Management Defendants – provided KI and ZI with substantially identical, phony "diagnoses," despite the fact that they were differently situated.

(x)      On September 6, 2017, two Insureds – F.B. and I.L.– were involved in the same minor automobile accident FB and IL were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that FB and IL suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative follow-up examinations of FB and IL at Sedani Medical on February 26, 2018, Sedani – at the direction of the Management Defendants – provided FB and IL with substantially identical, phony "diagnoses," despite the fact that they were differently situated.

(xi)     On September 12, 2016, two Insureds – M.B. and J.D. – were involved in the same minor automobile accident MB and JD were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that MB and JD suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative follow-up examinations of MB and JD at Sedani Medical on May 8, 2017, Sedani – at the direction of the Management Defendants – provided MB and JD with substantially identical, phony "diagnoses," despite the fact that they were differently situated.

(xii)    On September 17, 2017, two Insureds – R.D. and E.P. – were involved in the same minor automobile accident RD and EP were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that RD and EP suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative follow-up examinations of RD and EP at Sedani Medical on October 17, 2017, Sedani – at the direction of the Management Defendants – provided RD and EP with substantially identical, phony "diagnoses," despite the fact that they were differently situated.

304.    These are only representative examples. In the claims for follow-up examinations that are identified in Exhibits "1" and "2", Basu and Sedani – at the direction of the Management Defendants – frequently falsely reported that two or more Insureds who were involved in the same underlying accident suffered substantially identical injuries that continued to manifest themselves, in the same way, during contemporaneous follow-up examinations weeks or even months after the underlying accidents.

305.    Basu and Sedani routinely inserted these false "diagnoses" in their follow-up examination reports in order to create the false impression that the follow-up examinations actually were legitimately performed, and in order to create a false justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

**3.      The Fraudulent Charges for Electrodiagnostic Testing**

306.    As set forth in Exhibits "1" and "2" based upon the fraudulent, predetermined "diagnoses" provided during the initial examinations, the Defendants purported to subject many Insureds to a series of medically unnecessary, useless, and illusory electrodiagnostic ("EDX") tests, including nerve conduction velocity ("NCV") tests, and electromyography ("EMG") tests.

307.    Typically, Basu or Sedani purported to perform the EDX tests, which then were billed to GEICO through NQ Medical or Sedani Medical.

308.    The charges for the EDX tests were fraudulent in that the EDX tests were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the Defendants' fraudulent treatment protocol, not to treat or otherwise benefit the Insureds.

**a.      The Human Nervous System and Electrodiagnostic Testing**

309.    The human nervous system is composed of the brain, spinal cord, and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet.

310.    Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

311.    The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.

312.    Peripheral nerves consist of both sensory and motor nerves. They carry electrical impulses throughout the body, originating from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

313.    The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots.  A "pinched" nerve root is called a radiculopathy, and can cause various symptoms including pain, altered sensation and loss of muscle control.

314.    EMGs and NCVs are forms of EDX tests, and purportedly were provided by the Defendants because they were medically necessary to determine whether the Insureds had radiculopathies.

315.    The American Association of Neuromuscular Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy

(the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

316.    The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

317.    According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies.

318.    According to the Recommended Policy, the maximum number of EMG tests necessary to diagnose a radiculopathy in 90 percent of all patients is EMG tests of two limbs.

319.    According to the Recommended Policy, both NCV tests and EMG tests normally must be performed together in order to provide a clinical diagnosis of peripheral nervous system disorders, including radiculopathies. As the Recommended Policy states:

> Radiculopathies cannot be diagnosed by NCS [Nerve Conduction Studies] alone; needle EMG must be performed to confirm a radiculopathy. Therefore, these studies should be performed together by one physician supervising and/or performing all aspects of the study.
> …
>
> The EDX laboratory must have the ability to perform needle EMGs. NCSs should not be performed without needle EMG except in unique circumstances."

**b.    The Fraudulent NCV Tests**

320.    NCV tests are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is transmitted, measured, and recorded with electrodes attached to the surface of the skin. An EMG machine then documents the timing of the nerve response (the

"latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance from one stimulus to another (the "conduction velocity").

321.     In addition, the EMG machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

322.     In order to be clinically useful in the diagnoses of peripheral nervous system disorders, NCVs and EMGs must be performed together.

323.     There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCV tests. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCV tests.

324.     F-wave and H-reflex studies are additional types of NCV tests that may be conducted in addition to the sensory and motor nerve NCV tests. F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory NCV studies are designed to evaluate nerve conduction in nerves within a limb.

325.     As set forth above, in many instances, the Managements Defendants, Basu, Sedani, and the Provider Defendants submitted billing to GEICO for NCVs – or caused such billing to be submitted – despite the fact that no corresponding EMGs had been performed, making the tests useless in the diagnosis and treatment of the Insureds.

326.     In an attempt to extract the maximum billing out of each Insured who supposedly received NCV tests, Basu, Sedani, and the Provider Defendants – at the direction of the Management Defendants – routinely purported to test far more nerves than recommended by the Recommended Policy.

327.     Specifically, to maximize the fraudulent charges that they could submit to GEICO and other insurers, the Defendants routinely purported to perform and/or provide: (i) NCV tests of 10 motor nerves; (ii) NCV tests of 12 sensory nerves; (iii) multiple F-wave studies; and (iv) multiple H-reflex studies.

328.     For example, in the claims identified in Exhibits "1" – "2", the Defendants purported to provide this massive, medically unnecessary amount of NCV tests to – among many others – the following Insureds:

(i)      JG;

(ii)     FW;

(iii)    KG;

(iv)     LD;

(v)      SJ;

(vi)     OK;

(vii)    NA;

(viii)   SA;

(ix)     JD;

(x)      EH;

(xi)     II; and

(xii)    LJ

329.    These are only representative examples. In the claims for EDX testing that are identified in Exhibits "1" and "2", Basu and Sedani – at the direction of the Management Defendants – frequently purported to provide a massive, medically unnecessary amount of NCV tests to numerous Insureds.

330.    The Management Defendants were concerned that the massive, medically unnecessary number of NCV tests they were causing Basu, Sedani, and the Provider Defendants to purport to provide would draw attention to their fraudulent scheme.

331.    Accordingly, the Management Defendants, Basu, Sedani, NQ Medical, and Sedani Medical acted to conceal the number of NCV tests they provided to any individual Insured, by purporting to provide the tests on multiple days and splitting the billing for the NCV tests into two separate bills for each individual Insured.

332.    Other than to conceal the massive number of NCV tests they purported to provide to each individual Insured, there was no reason why the Management Defendants, Basu, Sedani, NQ Medical, and Sedani Medical would perform the NCV tests on multiple days and split the billing for the NCV tests into two separate bills for each individual Insured.

333.    The decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

334.    In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers. As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCV tests should vary from patient-to-patient.

335.     This concept is emphasized in the Recommended Policy, which states that:  EDX studies [such as NCVs] are individually designed by the electrodiagnostic consultant for each patient.  The examination design is dynamic and often changes during the course of the study in response to new information obtained.

336.     This concept also is emphasized in the CPT Assistant, which states that "Pre-set protocols automatically testing a large number of nerves are not appropriate."

337.     Basu, Sedani, and the Provider Defendants did not tailor the NCVs they purported to perform and/or provide to the unique circumstances of each individual Insured.

338.     Instead, they applied a fraudulent "protocol" and purported to perform and/or provide NCVs on the same peripheral nerves and nerve fibers in virtually all of the NCV claims identified in Exhibits "1" – "2".

339.     In particular, Basu, Sedani, and the Provider Defendants purported to test some combination of the following peripheral nerves and nerve fibers – and, in most cases, all of them – in virtually all of the NCV test claims identified in Exhibits "1" – "2":

(i)      left and right median motor nerves;

(ii)     left and right ulnar motor nerves;

(iii)    left and right peroneal motor nerves;

(iv)     left and right radial motor nerves;

(v)      left and right tibial motor nerves;

(vi)     left and right ulnar motor nerves;

(vii)    left and right median sensory nerves;

(viii)   left and right radial sensory nerves;

(ix)     left and right ulnar sensory nerves.

(x)      left and right superficial peroneal sensory nerves; and

(xi)     left and right sural sensory nerves; and

(xii)    left and right lateral plantar sensory

340.    The cookie-cutter approach to the NCV tests that Basu, Sedani, and the Provider Defendants purported to provide to Insureds clearly was not based on medical necessity. Instead, the cookie-cutter approach to the NCV tests was designed solely to maximize the charges that the Defendants could submit to GEICO and other insurers, and to maximize their ill-gotten profits.

341.    Assuming that all other conditions of coverage are satisfied, the NY Fee Schedule permitted lawfully licensed healthcare providers in the New York metropolitan area to submit maximum charges of: (i) $106.47 under CPT code 95904 for each sensory nerve in any limb on which an NCV test was performed; (ii) $166.47 under CPT code 95903 for each motor nerve in any limb on which an NCV test was performed; and (iii) $119.99 under CPT code 95934 for each H-Reflex test that was performed on the nerves of any limb.

342.    Basu, Sedani, and the Provider Defendants – at the direction of the Management Defendants – purported to provide and/or perform NCV tests on far more nerves than recommended by the Recommended Policy so as to maximize the fraudulent charges that could be submitted to GEICO and other insurers, not because the NCV tests were medically necessary.

c.       **The Fraudulent EMG Tests**

343.    Basu, Sedani, and the Provider Defendants also purported to perform medically unnecessary EMGs on Insureds as part of the Defendants' fraudulent treatment and billing protocol.

344.    EMGs involve insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The sound and appearance of the electrical activity in each muscle are compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the nerve roots, peripheral nerves, or muscles.

345.    There are many different muscles in the arms and legs that can be tested using EMGs. The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is based upon a history and physical examination of each individual patient, as well as the real-time results obtained from the EMGs as they are performed on each specific muscle. As a result, the number of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient-to-patient.

346.    Though, in many cases, EMG tests are purportedly provided on Insureds in order to determine whether the Insureds suffered from radiculopathies, no adequate neurological history and examination is performed to create a foundation for the EDX testing. In actuality, the EMG tests are performed on Insureds as part of the Defendants' predetermined, fraudulent testing and treatment protocol designed to maximize the billing that they submit for each Insured.

347.     The performance of the EMGs is not tailored to the unique circumstances of each patient. Instead, Basu, Sedani, and the Provider Defendants routinely purported to test the same muscles in the same limbs, without regard for individual patient presentation.

348.     Furthermore, even if there were any need for any of these EMGs, the nature and number of the EMGs that are generally performed grossly exceed the maximum number of such tests – i.e., EMGs of two limbs – that should be necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy. Typically, Basu, Sedani, and the Provider Defendants purport to conduct EMGs on all four limbs, in contravention of the Recommended Policy, in order to maximize the fraudulent billing that they can submit or cause to be submitted to GEICO and other insurers.

349.     More specifically, if all other conditions of coverage are satisfied, the Fee Schedule permits lawfully licensed physicians in the metropolitan New York area to submit maximum EMG charges of: (i) $185.73 under CPT code 95860 if an EMG is performed on at least five muscles of one limb; (ii) $241.50 under CPT code 95861 if an EMG is performed on at least five muscles in each of two limbs; (iii) $314.34 under CPT code 95863 if an EMG is performed on at least five muscles in each of three limbs; and (iv) $408.64 under CPT code 95864 if an EMG is performed on at least five muscles in each of four limbs.

350.     Basu, Sedani, and the Provider Defendants typically purported to perform EMGs on muscles in all four limbs for Insureds solely to maximize the profits that they can reap from each such Insured.

351.     Basu, Sedani, the Provider Defendants, and the Management Defendants utilized this fraudulent treatment and billing protocol to increase by an order of magnitude the charges for EDX testing that they submitted, or caused to be submitted, to GEICO and other insurers.

Through their fraudulent billing practices, the Provider Defendants routinely submitted billing in excess of $3500.00 for Insureds who purportedly received: (i) a four-limb EMG; (ii) NCVs of eight motor nerves with F-wave studies; (iii) NCVs of twelve sensory nerves; and (iv) four H-reflex studies, all of which were medically unnecessary and were purportedly performed – to the extent they were performed at all – merely to maximize the fraudulent charges that the Provider Defendants and the Management Defendant submitted to GEICO and other insurers.

352.     The Management Defendants were concerned that the unnecessary number of NCVs and EMGs they were causing Basu, Sedani, and the Provider Defendants to purport to provide would draw attention to their fraudulent scheme.

353.     Accordingly, the Management Defendants, Basu, Sedani, NQ Medical, and Sedani Medical acted to conceal the number of NCVs and EMGs they provided to any individual Insured, by purporting to provide the tests on multiple days and splitting the billing for the NCVs and EMGs into two separate bills for each individual Insured.

354.     Other than to conceal the massive number of NCVs and EMGs they purported to provide to each individual Insured, there was no reason why the Management Defendants, Basu, Sedani, NQ Medical, and Sedani Medical would perform the NCVs and EMGs on multiple days and split the billing for the NCVs and EMGs into two separate bills for each individual Insured.

355.     What is more, in further keeping with the fact that Basu, Sedani, and the Provider Defendants purported to perform the EDX tests pursuant to a fraudulent, predetermined treatment and billing protocol, and without regard to patient care, in at least some cases, no one associated with the Provider Defendants actually performed the EMGs, even though the Provider Defendants and the Management Defendants billed GEICO for both EMGs and NCVs.

356.    No legitimate physician exercising independent medical judgment would permit the fraudulent treatment and billing protocol described above to proceed under his or her auspices.

357.    Basu, Sedani, and the Provider Defendants routinely purported to perform medically unnecessary NCVs and EMGs – to the extent they were performed at all – so as to maximize the fraudulent charges that they submitted to GEICO and other insurers.

**d.      The Fraudulent Radiculopathy "Diagnoses"**

358.    Radiculopathies are relatively rare in motor vehicle accident victims, occurring in – at most – 19 percent of accident victims according to a large-scale, peer-reviewed 2009 study conducted by Randall L. Braddom, M.D., Michael H. Rivner, M.D., and Lawrence Spitz, M.D. and published in <u>Muscle & Nerve</u>, the official journal of the AANEM.

359.    Furthermore, the cohort of accident victims considered in the study by Drs. Braddom, Rivner, and Spitz had been referred to a tertiary EDX testing laboratory at a major university teaching hospital, and therefore represented a more severely injured group of patients than the Insureds whom the Defendants purportedly treated.

360.    As a result, the frequency of radiculopathy in <u>all</u> motor vehicle accident victims – not only those who have relatively serious injuries that require referral to a major hospital EDX laboratory – is likely to be significantly lower than 19 percent.

361.    Virtually none of the Insureds whom Basu, Sedani, and the Provider Defendants purported to treat suffered any serious medical problems as the result of any automobile accident, much less any radiculopathy.

362.     Even so, Basu, Sedani, and the Provider Defendants falsely purported to diagnose radiculopathies in the substantial majority of the Insureds that purportedly received electrodiagnostic testing.

363.     Basu, Sedani, and the Provider Defendants purported to arrive at their predetermined radiculopathy diagnoses in order to create the appearance of severe injuries and thereby provide a false justification for the medically unnecessary Fraudulent Services provided through the Defendants.

**3.      The Fraudulent Charges for Computerized Range of Motion and Muscle Strength Test**

364.     In an attempt to maximize the fraudulent billing that they submit or cause to be submitted for each Insured, the Management Defendants, Basu, NQ Medical, Sedani, Sedani Medical, Lee, Four Seasons Chiro, Park, and ASAP Chiro also instructed many Insureds to return to the Sing Clinics for one or more rounds of medically useless computerized range of motion and muscle strength tests.

365.     As set forth in Exhibits "1" – "2" and "10" – "11", Basu, NQ Medical, Sedani, Sedani Medical, Lee, Four Seasons Chiro, Park, and ASAP Chiro then purported to provide, and billed, the computerized range of motion tests to GEICO under CPT code 95851, and the computerized muscle strength tests to GEICO under CPT code 95831, typically resulting in over $1,000.00 in charges for every Insured who supposedly received the tests.

366.     The charges for the computerized range of motion and muscle strength tests were fraudulent in that the computerized range of motion and muscle strength tests were medically unnecessary and were performed pursuant to the Defendants' fraudulent treatment and billing protocol, not to legitimately treat or otherwise benefit the Insureds who were subjected to them.

a.      **Traditional Tests to Evaluate the Human Body's Range of Motion and Muscle Strength**

367.      The adult human body is made up of 206 bones joined together at various joints that either are of the fixed, hinged or ball-and-socket variety. The body's hinged joints and ball-and-socket joints facilitate movement, allowing a person to – for example – bend a leg, rotate a shoulder, or move the neck to one side.

368.      The measurement of the capacity of a particular joint to perform its full and proper function represents the joint's "range of motion". Stated in a more illustrative way, range of motion is the amount that a joint will move from a straight position to its bent or hinged position.

369.      A traditional, or manual, range of motion test consists of a non-electronic measurement of the joint's ability to move in comparison with an unimpaired or "ideal" joint. In a traditional range of motion test, the physician asks the patient to move his or her joints at various angles, or the physician moves the joints. The physician then evaluates the patient's range of motion either by sight or through the use of a manual inclinometer or a goniometer (i.e., a device used to measure angles).

370.      Similarly, a traditional muscle strength test consists of a non-electronic measurement of muscle strength, which is accomplished by having the patient move his/her body in a given direction against resistance applied by the physician. For example, if a physician wanted to measure muscle strength in the muscles surrounding a patient's knee, he would apply resistance against the patient's leg while having him/her move the leg up, then apply resistance against the patient's leg while having him/her move the leg down.

371.      Physical examinations performed on patients with soft-tissue trauma – the alleged complaint advanced by virtually every Insured who treated with Interstate and Highland –

necessarily require range of motion and muscle strength tests, inasmuch as these tests provide a starting point for injury assessment and treatment planning. Unless a physician knows the extent of a given patient's joint or muscle strength impairment, there is no way to properly diagnose or treat the patient's injuries. Evaluation of range of motion and muscle strength is an essential component of the "hands-on" examination of a trauma patient.

372.    Since range of motion and muscle strength tests must be conducted as an element of a soft-tissue trauma patient's initial examination, as well as during any follow-up examinations, the Fee Schedule provides that range of motion and muscle strength tests are to be reimbursed as an element of the initial consultations and follow-up examinations.

373.    In other words, healthcare providers cannot conduct and bill for an initial consultation or follow-up examination, then bill separately for contemporaneously-provided computerized range of motion and muscle strength tests.

**b.    The Duplicate Billing for Medically Unnecessary Computerized Range of Motion Tests**

374.    Physicians and healthcare providers associated with the Singh Clinics, including Basu, Sedani, Lee, and Park purported to repeatedly conduct manual range of motion and muscle tests on virtually every Insured during each initial and/or follow-up examination.

375.    The charges for these manual range of motion and manual muscle tests were part and parcel of the charges that the healthcare providers at the Singh Clinics routinely submitted for the initial examinations and follow-up examinations.

376.    Despite the fact that every Insured already purportedly had undergone manual range of motion and muscle testing during their initial examinations and/or follow-up examinations, and despite the fact that reimbursement for range of motion and muscle testing already had been paid by GEICO as a component of reimbursement for the initial examinations

and/or follow-up examinations, the Management Defendants, Basu, NQ Medical, Sedani, Sedani Medical, Lee, Four Seasons Chiro, Park, and ASAP Chiro systemically billed for, and purported to provide, a series of medically unnecessary computerized range of motion and muscle strength tests to most Insureds.

377.    Basu, NQ Medical, Sedani, Sedani Medical, Lee, Four Seasons Chiro, Park, and ASAP Chiro purported to provide the computerized range of motion tests by placing a digital inclinometer or goniometer on various parts of the Insureds' bodies (affixed by Velcro straps) while the Insured was asked to attempt various motions and movements. The test was virtually identical to the manual range of motion testing that is described above and that purportedly was performed during each initial examination and follow-up examination, except that a digital printout was obtained rather than the provider manually documenting the Insured's range of motion.

378.    Basu, NQ Medical, Sedani, Sedani Medical, Lee, Four Seasons Chiro, Park, and ASAP Chiro purported to provide the computerized muscle strength tests by placing a strain gauge-type measurement apparatus against a stationary object, against which the patient pressed three-to-four separate times using various muscle groups. As with the computerized range of motion and muscle strength tests, this computerized muscle strength test was virtually identical to the manual muscle strength testing that is described above and that purportedly was performed during the initial examinations and/or follow-up examinations – except that a digital printout was obtained.

379.    The information gained through the use of the computerized range of motion and muscle strength tests was not significantly different from the information obtained through the

manual testing that was part and parcel of virtually every Insured's initial examination and follow-up examinations.

380.    In the relatively minor soft-tissue injuries allegedly sustained by the Insureds – to the extent that any of the Insureds suffered any injuries at all as the result of the automobile accidents they purported to experience – the difference of a few percentage points in the Insureds' range of motion reading or pounds of resistance in the Insureds' muscle strength testing was meaningless. This is evidenced by the fact that neither Basu, Sedani, Lee, Park, nor any other healthcare provider associated with the Provider Defendants or the Singh Clinics from which they operated, ever incorporated the results of computerized range of motion and muscle strength tests into the rehabilitation programs of any of the Insureds whom they purported to treat.

381.    The computerized range of motion and muscle strength tests were part and parcel of the Defendants' fraudulent scheme, inasmuch as the "service" was rendered pursuant to a pre-established protocol that: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich the Defendants.

**c.      The Fraudulent Unbundling of Charges for the Computerized Range of Motion and Muscle Tests**

382.    Not only did Basu, NQ Medical, Sedani, Sedani Medical, Lee, Four Seasons Chiro, Park, and ASAP Chiro deliberately purport to provide duplicative, medically unnecessary computerized range of motion and muscle strength tests, they also unbundled their billing for the tests in order to maximize the fraudulent charges that they could submit to GEICO.

383.    Pursuant to the Fee Schedule, when computerized range of motion testing and muscle testing are performed on the same date, all of the testing should be reported and billed using CPT code 97750.

384.    CPT code 97750, described as "Physical performance test or measurement (e.g., musculoskeletal, functional capacity), with written report, each 15 minutes," identifies a number of multi-varied tests and measurements of physical performance of a select area or number of areas. These tests include services such as extremity testing for strength, dexterity, or stamina, and muscle testing with torque curves during isometric and isokinetic exercise, whether by mechanized evaluation or computerized evaluation. They also include creation of a written report.

385.    CPT code 97750 is a "time-based" code that in the New York metropolitan area allows for a single charge of $45.71 for every 15 minutes of testing that is performed. Thus, if a provider performed 15 minutes of computerized range of motion and muscle testing, it would be permitted a single charge of $45.71 for the range of motion and muscle tests under CPT code 97750. If the provider performed 30 minutes of computerized range of motion and muscle testing, it would be permitted to submit two charges of $45.71 for the range of motion and muscle tests under CPT code 97750, resulting in total charges of $91.42, and so forth.

386.    Basu, NQ Medical, Sedani, Sedani Medical, Lee, Four Seasons Chiro, Park, and ASAP Chiro routinely purported to provide computerized range of motion and muscle strength tests to Insureds on the same dates of service.

387.    To the extent that Basu, NQ Medical, Sedani, Sedani Medical, Lee, Four Seasons Chiro, Park, and ASAP Chiro actually provided the computerized range of motion and muscle strength tests to Insureds in the first instance, the computerized range of motion and muscle strength tests together never took more than 15 minutes to perform. Thus, even if the computerized range of motion and muscle strength tests that Basu, NQ Medical, Sedani, Sedani Medical, Lee, Four Seasons Chiro, Park, and ASAP Chiro purported to provide were medically

necessary, and performed in the first instance, the Provider Defendants would be limited to a single, time-based charge of $45.71 under CPT code 97750 for each date of service on which it provided computerized range of motion and muscle strength tests to an Insured.

388.    Even so, in order to maximize their fraudulent billing for the computerized range of motion and muscle strength tests, Basu, NQ Medical, Sedani, Sedani Medical, Lee, Four Seasons Chiro, Park, and ASAP Chiro unbundled what should have been – at most – a single charge of $45.71 under CPT code 97750 for both computerized range of motion and muscle testing into: (i) multiple charges of $45.71 under CPT code 95851 (for the range of motion tests); and (ii) one or two charges of $43.60 under CPT code 95831 (for the muscle strength tests).

389.    By unbundling what should – at most – have been a single $45.71 charge under CPT code 97750 into multiple charges under CPT code 95851 and one or two charges under CPT code 95831, the Management Defendants, Basu, NQ Medical, Sedani, Sedani Medical, Lee, Four Seasons Chiro, Park, and ASAP Chiro typically inflated the fraudulent computerized range of motion and muscle strength tests charges that they submitted to GEICO by an order of magnitude. The Management Defendants, Basu, NQ Medical, Sedani, Sedani Medical, Lee, Four Seasons Chiro, Park, and ASAP Chiro routinely submitted billing for computerized range of motion and muscle strength tests rendered to an Insured on a single date of service for amounts of more than $1,000.00 for each session of medically unnecessary computerized range of motion and muscle strength testing.

**d.    The Fraudulent Misrepresentations Regarding the Existence of Written, Interpretive Reports for the Computerized Range of Motion and Muscle Strength Tests**

390.    Not only were the Defendants' charges for the computerized range of motion and muscle strength tests fraudulent because the tests were duplicative, medically unnecessary, and

because the billing was fraudulently unbundled, but the charges also were fraudulent because they falsely represented that Basu, NQ Medical, Sedani, Sedani Medical, Lee, Four Seasons Chiro, Park, and ASAP Chiro prepared written reports interpreting the test data.

391.    Pursuant to the NY Fee Schedule, when a healthcare provider submits a charge for computerized range of motion testing using CPT code 95851 or for computerized muscle testing using CPT code 95831, the provider represents that it has prepared a written report interpreting the data obtained from the test.

392.    The CPT Assistant states that "Interpretation of the results with preparation of a separate, distinctly, identifiable, signed written report is required when reporting codes 95851 and 95852".

393.    The CPT Assistant also states that "[t]he language included in the code descriptor for use of these codes indicates, the preparation of a separate written report of the findings as a necessary component of the procedure" when using CPT code 95831 to charge for muscle testing.

394.    Though the Management Defendants, Basu, NQ Medical, Sedani, Sedani Medical, Lee, Four Seasons Chiro, Park, and ASAP Chiro routinely submitted billing for the computerized range of motion and muscle strength tests using CPT codes 95851 and 95831, Basu, NQ Medical, Sedani, Sedani Medical, Lee, Four Seasons Chiro, Park, and ASAP Chiro did not prepare written reports interpreting the data obtained from the tests.

395.    Basu, NQ Medical, Sedani, Sedani Medical, Lee, Four Seasons Chiro, Park, and ASAP Chiro did not prepare written reports interpreting the data obtained from the tests because the tests were not meant to impact any Insured's course of treatment. Rather, to the extent they were performed at all, the tests were performed as part of the Defendants' predetermined

fraudulent billing and treatment protocol, and were designed solely to financially enrich the Defendants at the expense of GEICO and other insurers.

396.    In fact, to the extent that the computerized range of motion and muscle strength tests ever were performed in the first instance, they were performed – in their entirety – by unlicensed technicians whom Basu, NQ Medical, Sedani, Sedani Medical, Lee, Four Seasons Chiro, Park, and ASAP Chiro treated as independent contractors, with no physician involvement whatsoever.

**4.      The Fraudulent Charges for Physical Performance Testing**

397.    In an attempt to maximize the fraudulent billing that they submitted or caused to be submitted for each Insured, the Management Defendants caused S. Kim, H. Kim, Good Care PT, and Evergreen PT to routinely purported to subject Insureds in Exhibits "8" and "9" to medically useless physical performance testing ("PPT").

398.    Like the charges for the other Fraudulent Services, the charges for the PPT were fraudulent in that they were performed – to the extent they were performed at all –pursuant to the Defendants' fraudulent treatment and billing protocol, not to legitimately treat or otherwise benefit the Insureds who were subjected to them.

399.    The charges for the PPT were also fraudulent in that the PPT were duplicative and medically unnecessary, and the Management Defendants, S. Kim, H. Kim, Good Care PT, and Evergreen PT unbundled the charges for the PPT to fraudulently inflate the charges for PPT that they submitted to GEICO by an order of magnitude.

400.    S. Kim, H. Kim, Good Care PT, and Evergreen PT purported to provide PPT to Insureds despite their actual knowledge that the PPT, to the extent that they were performed at all, were medically unnecessary and duplicative of the manual range of motion and muscle

strength tests that purportedly were performed during every examination, and/or the computerized range of motion and muscle strength tests that Basu, NQ Medical, Sedani, Sedani Medical, Lee, Four Seasons Chiro, Park, and ASAP Chiro also purported to perform on the Insureds.

401.    Much like the duplicative computerized range of motion and muscle strength tests, the only substantive difference between the PPT and the manual range of motion and manual muscle strength tests purportedly provided by Basu, Sedani, NQ Medical, and Sedani Medical during the initial examinations and follow-up examinations, is that PPT generate a digital printout of an Insured's range of motion and/or muscle strength.

402.    The range of motion and muscle strength data obtained through the use of PPT are not significantly different from the information obtained through the manual testing that was part and parcel of the examinations purportedly provided by Basu, Sedani, NQ Medical, and Sedani Medical to Insureds.

403.    Nor were the range of motion and muscle strength data obtained through the use of PPT significantly different from the data that Basu, NQ Medical, Sedani, Sedani Medical, Lee, Four Seasons Chiro, Park, and ASAP Chiro obtained through the ROM/MT they purported to provide to Insureds.

404.    Under the circumstances employed by S. Kim, H. Kim, Good Care PT, and Evergreen PT, the PPT represented purposeful and unnecessary duplication of the manual range of motion and muscle strength testing purportedly conducted during virtually every Insured's initial examination and follow-up examinations, and of the medically unnecessary computerized range of motion and muscle strength testing which Basu, NQ Medical, Sedani, Sedani Medical,

Lee, Four Seasons Chiro, Park, and ASAP Chiro purportedly conducted in addition to the manual range of motion and muscle strength testing.

405.    Not only did S. Kim, H. Kim, Good Care PT, and Evergreen PT deliberately purport to provide duplicative, medically unnecessary PPT, they also unbundled their billing for the tests in order to maximize the fraudulent charges that they could submit to GEICO. The Management Defendants, S. Kim, H. Kim, Good Care PT, and Evergreen PT unbundled what should have been – at most – a single charge of $45.71 under CPT code 97750 for 15 minutes of testing that is performed. CPT code 97750 is a "time-based" code that – in the New York metropolitan area – allows for a single charge of $45.71 for every 15 minutes of testing that is performed. CPT code 97750 does not permit multiple, independent charges for PPT on various extremities or body parts.

406.    Even so, the Management Defendants, S. Kim, H. Kim, Good Care PT, and Evergreen PT routinely unbundled their charges for PPT by submitting multiple, independent charges for PPT on various extremities or body parts. The Management Defendants, S. Kim, H. Kim, Good Care PT, and Evergreen PT routinely submitted independent charges for PPT of the Insureds' arms, legs, torsos, and for performing various lifts, rather than on the basis of time spent purportedly providing PPT. Through this fraudulent billing protocol, the Management Defendants, S. Kim, H. Kim, Good Care PT, and Evergreen PT inflated the charges they submitted to GEICO for each distinct session of PPT by submitting six separate charges for CPT code 97750 and a total billing of $249.96 for what should have been – at most – a single charge of $45.71.

407.    In keeping with the fact that the PPT were medically useless, and provided – to the extent they were provided at all – solely for financial gain, the purported results of the PPT

were never incorporated into the Insureds' treatment plans, nor were the Insureds' treatment plans ever assessed or modified based on the purported results of the PPT. Rather, the Defendants continued to operate pursuant to the fraudulent predetermined treatment and testing protocol, regardless of the Insureds' individual symptoms or actual response to the purported treatment.

408.    The PPT were simply another component of the Defendants' fraudulent predetermined billing and treatment protocol which permitted them to submit, or cause to be submitted bills for hundreds of dollars per Insured for each PPT allegedly provided.

**5.    The Fraudulent Charges for Outcome Assessment Testing**

409.    In addition to the other Fraudulent Services, Basu, Sedani, NQ Medical, and Sedani Medical purported to subject Insureds to medically useless "outcome assessment tests".

410.    As set forth in Exhibits "1" and "2", Basu, Sedani, NQ Medical, and Sedani Medical billed the "outcome assessment tests" to GEICO under CPT code 99358, generally resulting in charges of $204.41 for each round of purported testing.

411.    Like Basu, Sedani, NQ Medical, and Sedani Medical's charges for the other Fraudulent Services, the charges for the "outcome assessment tests" were fraudulent in that the tests were medically unnecessary and were designed to maximize NQ Medical and Sedani Medical's fraudulent billing, not to treat or otherwise benefit the Insureds who supposedly were subjected to the tests.

412.    The "outcome assessment tests" that Basu, Sedani, NQ Medical, and Sedani Medical purported to provide Insureds were simply pre-printed, multiple-choice questionnaires on which the Insureds were invited to report the symptoms they purportedly were experiencing, and the impact of those symptoms on their lives. The Insureds' responses to the questionnaires

then were fed into a computer, which automatically generated a report that rated the Insureds' responses according to pre-set criteria.

413.    Under the circumstances employed by Basu, Sedani, NQ Medical, and Sedani Medical, the "outcome assessment tests" represented purposeful and unnecessary duplication of the patient histories purportedly conducted during each Insured's initial examination and follow-up examinations. The "outcome assessment tests" were part and parcel of the Defendants' fraudulent scheme, inasmuch as the "service" was rendered pursuant to a predetermined protocol that: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich the Defendants.

414.    The Management Defendants, Basu, Sedani, NQ Medical, and Sedani Medical's use of CPT codes 99358 to bill for the "outcome assessment tests" also constituted a deliberate misrepresentation of the extent of the service that was provided. Pursuant to the Fee Schedule, the use of CPT codes 99358 represents – among other things – that a physician actually spent at least one hour performing some prolonged service, such as review of extensive records and tests, or communication with the patient and his or her family.

415.    Though Basu, Sedani, NQ Medical, and Sedani Medical routinely submitted billing for the "outcome assessment tests" under CPT codes 99358, no physician associated with NQ Medical or Sedani Medical spent an hour reviewing or administering the tests, or any time at all, and the putative "results" of the tests were not incorporated into any Insured's treatment plan.

416.    In fact, to the extent that the "outcome assessment tests" ever were performed in the first instance, they were performed – in their entirety – by unlicensed technicians whom Basu, Sedani, NQ Medical, and Sedani Medical treated as independent contractors, with no physician involvement whatsoever.

6.      **The Fraudulent Charges for Acupuncture**

417.    In addition to the other Fraudulent Services, the Defendants routinely subjected Insureds to a course of medically unnecessary acupuncture services.

418.    The Defendants submitted or caused to be submitted bills for these acupuncture services through Rapapuncture, Aminova Acupuncture, Bright Acupuncture, YC Acupuncture, and Choi Acupuncture.

419.    Like the Defendants' charges for the other Fraudulent Services, the charges for acupuncture services were fraudulent in that the services were performed – to the extent they were performed at all – pursuant to the illegal kickback arrangement and Defendants' predetermined fraudulent billing and treatment protocol designed solely to maximize profits. This predetermined, fraudulent protocol was grounded on boilerplate examinations and reports used to support excessive and medically unnecessary acupuncture services not warranted by the patients' conditions.

420.    Pursuant to the Defendants' fraudulent predetermined treatment and billing protocol, virtually every insured was referred for a course of acupuncture services that involved an identical treatment plan consisting of the same acupuncture services being rendered multiple times per week for months.

a.      **Legitimate Acupuncture Practices**

421.    Acupuncture is predicated upon the theory that there are twelve main meridians ("the Meridians") in the human body through which energy flows. Every individual has a unique energy flow ("Qi" or Chi"). When an individual's unique Chi becomes disrupted or imbalanced for any reason (such as trauma), needles can be inserted or pressure can be applied to very

specific points ("Acupuncture Points") along the Meridians to remove the disruption or imbalance and restore the patient's unique Chi.

422.    The goal of any legitimate acupuncture treatment is to effectively treat and benefit the patient by restoring his or her unique Chi, relieving his or her symptoms, and returning him or her to normal activity.

423.    The first step in any legitimate acupuncture treatment is a physical examination of the patient which is comprised of three components: (1) palpation of the areas of complaint; (2) an assessment of the patient's functionality (i.e., range of motion, ability to perform activities of daily living, etc.); and (3) an assessment of the patient's energy system which includes an examination of the appearance of the patient's tongue (i.e., color, shape, texture, etc.) and measurements of the patient's pulse (i.e., rate, rhythm, strength, etc.).

424.    In cases involving trauma, a physical examination is appropriate to identify the location of the injury and the consequent pain and, by extension, to identify Meridians, if any, that have been disrupted.  Examination of the appearance of the patient's tongue and various measurements of the patient's pulse assist with the diagnosis of the patient's condition and thereby helps develop an acupuncture treatment plan designed to benefit the patient by restoring his unique Chi.

425.    The second step in any legitimate acupuncture treatment is the development of an acupuncture treatment plan. In developing a legitimate treatment plan, an acupuncturist will consider both the injuries sustained by the patient, as well as the tongue and pulse information obtained during the physical examination. Using this information, the acupuncturist will identify a unique, cohesive, and individualized set of Acupuncture Points into which needles can be

inserted or pressure can be applied to restore the patient's Chi and address the patient's discrete injuries.

426.    In developing a legitimate acupuncture treatment plan, an acupuncturist must choose from at least 360 discrete Acupuncture Points. Any legitimate acupuncture treatment plan should include the use of both "local" Acupuncture Points (i.e., points near the affected areas of the relevant Meridian), and "distal" Acupuncture Points (i.e., points that are distant from the affected areas of the relevant Meridian).

427.    The third step in any legitimate acupuncture treatment is the implementation of the acupuncture treatment plan.  If performed legitimately, this step typically will involve insertion of between 10 and 20 acupuncture needles into between 5 and 10 Acupuncture Points for a minimum of 20 minutes. Within these parameters, the number and location of the Acupuncture Points generally will vary based upon the unique circumstances presented by each patient as well as each patient's individual therapeutic response to each acupuncture treatment.

428.    As part of a legitimate acupuncture treatment plan, the weekly treatment sessions typically should decrease the first two weeks, leaving more time between treatments to assess how long the patient remains pain-free between treatments and/or how long the therapeutic effect of such treatments can be maintained between treatments.

429.    Any legitimate acupuncture treatment plan requires a continuous assessment of the patient's condition and energy flow, as well as the therapeutic effect of previous treatments. Acupuncture treatment plans are fluid and evolve over time. Therefore, the goal of any legitimate acupuncture treatment plan is to make appropriate adjustments as treatment progresses in order to improve the therapeutic effectiveness of each treatment, and eventually to return the patient to maximum health by restoring his or her unique energy flow.

430.    Any legitimate acupuncture treatment requires meaningful documentation of the: (i) physical examination; (ii) diagnosis; (iii) treatment plan; (iv) results of each session; and (v) the patient's  progress throughout the course of treatment.

**b.    The Defendants' Fraudulent Initial Acupuncture Examinations**

431.    Rapaport, Rapapuncture, Aminova, Aminova Acupuncture, Bright, Bright Acupuncture, Choi, YC Acupuncture, and Choi Acupuncture (collectively the "Acupuncture Defendants") – at the direction of the Management Defendants – routinely purported to begin their treatment of Insureds with an initial acupuncture examination which was billed under CPT code 99203 resulting in a charge of $104.08 or $154.30.

432.    The charges for the initial examinations were fraudulent in that they misrepresented the Acupuncture Defendants' eligibility to bill for or to collect No-Fault Benefits in the first instance. In fact, the Provider Defendants never were eligible to bill for or to collect No-Fault Benefits, because they were unlawfully owned and controlled by the Management Defendants in contravention of New York law.

433.    Furthermore, the Acupuncture Defendants' charges for the initial acupuncture examinations were fraudulent in that they misrepresented the extent of the examinations.

434.    The use of CPT code 99203 typically requires that the examining acupuncturist spend 30 minutes of face-to-face time with the Insured or the Insured's family.

435.    Though the Acupuncture Defendants virtually always billed for their putative initial examinations in the claims identified in Exhibits "3" - "7" under CPT code 99203, neither Rapaport, Aminova, Bright, Choi, nor any other acupuncturist associated with the Acupuncture Defendants, ever spent 30 minutes of face-to-face time with the Insureds or their families during

the initial examinations. Rather, the initial examinations rarely lasted more than 10-15 minutes, to the extent that they were conducted at all.

436. In keeping with the fact that the initial examinations rarely lasted more than 10-15 minutes, the Acupuncture Defendants used template forms in conducting the examinations which consisted primarily of boilerplate language and pre-printed checklists.

437. The pre-printed checklist and template forms that Acupuncture Defendants used in conducting the initial acupuncture examinations set forth a very limited range of potential patient complaints, potential diagnoses, and treatment recommendations and did not document any objective clinical findings.

438. The pre-printed checklist and template forms that the Acupuncture Defendants used do not reflect any genuine examination of the Insureds and contain purported findings that were, at best, a reiteration of the Insureds' alleged subjective complaints.

439. What is more, and in keeping with the fact that Rapapuncture, Aminova Acupuncture, Bright Acupuncture, YC Acupuncture, and Choi Acupuncture are all unlawfully owned and controlled by the Management Defendants—despite purporting to be independent acupuncture practices owned by different licensed acupuncturists—all five acupuncture practices utilized the same exact boilerplate checklist forms.

440. In the claims for initial examinations identified in Exhibits "3" - "7", the Defendants routinely falsely represented that the examinations involved 30 minutes of face-to-face time between the examining acupuncturist and the Insureds or the Insureds' families in order to create a false basis to bill for the examinations under CPT codes 99203, because examinations billable under CPT codes 99203 are reimbursable at higher rates than examinations that require less time to perform.

441.    In keeping with the fact that the initial examinations were performed under the direction and control of non-licensed laypersons, without regard to patient care, and solely to maximize profits, virtually every initial examination report submitted by the Acupuncture Defendants to GEICO directed the patients to return to the Singh Clinics three to four times per week.

**c.    The Acupuncture Defendants' Fraudulent Acupuncture Treatment**

442.    Following the fraudulent initial acupuncture examinations, the Acupuncture Defendants purported to provide acupuncture treatments that were billed to GEICO primarily under CPT codes 97810, 97811, 97813, and 97814 typically resulting in charges of between $25.68 and $57.20 per unit of acupuncture.

443.    The purported acupuncture services provided by the Acupuncture Defendants did not remotely comport with any of the aforesaid basic, legitimate acupuncture requirements.

444.    All patients were treated with a small number of repetitive and virtually identical point prescriptions, without regard to any necessary individual treatment strategies, without regard to any necessary adjustments in treatment as treatment progresses over time, and without meaningful, genuine, and individualized documentation.  As such, these acupuncture treatments were not medically necessary. Indeed, they were designed solely to enrich the Defendants through the submission of fraudulent charges to GEICO and other insurers.

445.    At best, the purported acupuncture services provided by the Acupuncture Defendants consisted of inserting needles into Insureds in an assembly-line fashion that bore little, if any, relation to the Insureds' conditions and were not designed to effectively treat or otherwise benefit the Insureds.

446.    The services billed for by the Acupuncture Defendants also reflect a lack of independent professional acupuncture judgment and instead reflect a predetermined protocol designed to enrich the Defendants through the submission of fraudulent charges to GEICO and other insurers.

447.    In keeping with the fact that the acupuncture treatments purportedly provided by the Acupuncture Defendants were designed to maximize profit and not to genuinely treat patients, the Acupuncture Defendants virtually always failed to keep progress notes, interval notes, or otherwise track the utility of the services they purported to provide or the progress of the patients.

448.    In further keeping with the fact that the acupuncture treatments purportedly provided by the Acupuncture Defendants were designed to maximize profit and not to genuinely treat patients, the Acupuncture Defendants virtually always utilized an insufficient number of needles and points on the body to legitimately address the physical injuries they purported to treat.

449.    Through this fraudulent treatment and billing protocol, the Defendants substantially inflated the bills they submitted or caused to be submitted to GEICO for the purported acupuncture services.

450.    The Acupuncture Defendants' boilerplate approach to the acupuncture treatments that they purportedly performed, or caused to be performed, on virtually every Insured was designed solely to maximize the charges that they could submit to GEICO and other insurers, and to maximize the Defendants' ill-gotten profits.

**7.      The Fraudulent Charges for Chiropractic and Physical Therapy**

451.    As part of the Defendants' fraudulent treatment protocol, Basu, NQ Medical, Sedani, Sedani Medical, S. Kim, Good Care PT, H. Kim, Evergreen PT, Lee, Four Seasons Chiro, Park, ASAP Chiro, Kimmel, and Kimmel Chiro (collectively, "Chiro-PT Defendants") purported to subject many Insureds to a series of medically unnecessary treatments, including chiropractic manipulation, electrical stimulation, and physical therapy exercises.

452.    Like the Defendants' charges for the other Fraudulent Services, the charges for chiropractic treatment and physical therapy treatment were fraudulent in that the services were performed – to the extent they were performed at all – pursuant to the illegal kickback arrangements and Defendants' predetermined fraudulent billing and treatment protocol designed solely to maximize profits. This predetermined, fraudulent protocol was grounded on boilerplate examinations and reports used to support excessive and medically unnecessary treatment not warranted by the patients' conditions.

453.    Virtually none of the Insureds who presented to the Chiro-PT Defendants for treatment suffered any injuries at all as the result of the minor automobile accidents they purportedly experienced, much less any injuries requiring months of physical therapy or chiropractic services.

454.    In most cases, the Insureds did not go to the hospital at all following their putative accidents and, to the extent that they did visit a hospital or other legitimate healthcare provider after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way.

455.    Nonetheless, pursuant to the Defendants' fraudulent treatment and billing protocol, following their initial examination/consultations and follow-up examinations, virtually

every Insured was prescribed a medically unnecessary, extended course of physical therapy and chiropractic services.

**8.    The Fraudulent Billing for Services Provided by Independent Contractors**

456.    The Defendants' fraudulent scheme also included submission of claims to GEICO seeking payment for services performed by independent contractors. Under the No-Fault Laws, healthcare providers are ineligible to bill or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the healthcare providers themselves, or by their employees.

457.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the No-Fault Laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-11-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the

CMS).

458.    Basu was the only healthcare services provider employed by NQ Medical.

459.    Sedani was the only healthcare services provided employed by Sedani Medical.

460.    Rapaport was the only healthcare services provider employed by Rapapuncture.

461.    S. Kim was the only healthcare services provider employed by Good Care PT.

462.    H. Kim was the only healthcare services provider employed by Evergreen PT.

463.    Lee was the only healthcare services provider employed by Four Seasons Chiro.

464.    Park was the only healthcare services provider employed by ASAP Chiro.

465.    Even so, the Defendants routinely submitted charges to GEICO and other insurers under the tax identification numbers of NQ Medical, Sedani Medical, Rapapuncture, Good Care PT, Evergreen PT, Four Seasons Chiro, and ASAP Chiro for Fraudulent Services that were provided – to the extent that they were provided at all – by professionals other than Basu, Sedani, Rapaport, S. Kim, H. Kim, Lee, or Park.

466.    In keeping with the fact that the physicians, chiropractors, acupuncturists, physical therapists, technicians, or unlicensed individuals were independent contractors and not employees of the Provider Defendants, these individuals reported to and worked under Singh and the Managements, who could not lawfully own and control the Provider Defendants.

467.    To the extent that they were performed in the first instance, all of the Fraudulent Services performed by healthcare providers other than Basu, Sedani, Rapaport, S. Kim, H. Kim, Lee, or Park were performed by physicians, chiropractors, acupuncturists, physical therapists, technicians, or unlicensed individuals whom the Defendants treated as independent contractors.

468.    For instance, the Defendants:

(i)     paid the physicians, chiropractors, acupuncturists, physical therapists, technicians, or unlicensed individuals, either in whole or in part, on a 1099 basis rather than a W-2 basis;

(ii)    established an understanding with the physicians, chiropractors, acupuncturists, physical therapists, technicians, or unlicensed individuals that they were independent contractors, rather than employees;

(iii)   paid no employee benefits to the physicians, chiropractors, acupuncturists, physical therapists, technicians, or unlicensed individuals;

(iv)    failed to secure and maintain W-4 or I-9 forms for the physicians, chiropractors, acupuncturists, physical therapists, technicians, or unlicensed individuals;

(v)     failed to withhold federal, state or city taxes on behalf of the physicians, chiropractors, acupuncturists, physical therapists, technicians, or unlicensed individuals;

(vi)    compelled the physicians, chiropractors, acupuncturists, physical therapists, technicians, or unlicensed individuals to pay for their own malpractice insurance at their own expense;

(vii)   permitted the physicians, chiropractors, acupuncturists, physical therapists, technicians, or unlicensed individuals to set their own schedules and days on which they desired to perform services;

(viii)  permitted the physicians, chiropractors, acupuncturists, physical therapists, technicians, or unlicensed individuals to maintain non-exclusive relationships and perform services for their own practices and/or on behalf of other medical practices;

(ix)    failed to cover the physicians, chiropractors, acupuncturists, physical therapists, technicians, or unlicensed individuals for either unemployment or workers' compensation benefits; and

(x)     filed corporate and payroll tax returns (e.g. Internal Revenue Service ("IRS") forms 1120 and 941) that represented to the IRS and to the New York State Department of Taxation that the physicians, chiropractors, acupuncturists, physical therapists, technicians, or unlicensed individuals were independent contractors.

469.    By electing to treat the physicians, chiropractors, acupuncturists, physical therapists, technicians, or unlicensed individuals as independent contractors, the Defendants realized significant economic benefits – for instance:

(i)      avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

(ii)     avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

(iii)    avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv)     avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

(v)      avoiding the need to secure any malpractice insurance; and

(vi)     avoiding claims of agency-based liability arising from work performed by the physicians, chiropractors, acupuncturists, physical therapists, technicians, or unlicensed individuals.

470.    Because the physicians, chiropractors, acupuncturists, physical therapists, technicians, or unlicensed individuals were independent contractors and performed the Fraudulent Services, the Defendants never had any right to bill for or collect No-Fault Benefits in connection with those services.

471.    The Defendants billed for the Fraudulent Services as if they were provided by actual employees of the Provider Defendants to make it appear as if the services were eligible for reimbursement. The Defendants' misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services, when in fact GEICO was not.

472.    In some cases, the Defendants attempted to conceal the fact that the Fraudulent Services were performed by independent contractors by falsely listing Basu, Sedani, Rapaport, S. Kim, H. Kim, Lee, or Park on the billing as the treating provider, or by falsely contending – in their billing for the Fraudulent Services – that the physicians, chiropractors, acupuncturists, physical therapists, technicians, or unlicensed individuals were employees of the Provider Defendants.

## IV.   The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO

473.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms and treatment reports through the Provider Defendants to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

474.    The NF-3 forms and treatment reports submitted to GEICO by and on behalf of the Defendants were false and misleading in the following material respects:

(i)     The NF-3 forms and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services were not medically necessary and were performed – to the extent that they were performed at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

(ii)    The NF-3 forms and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

(iii)   The NF-3 forms and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Provider Defendants were lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).   In fact, the Provider Defendants were not properly licensed in they were putative healthcare practices that illegally were owned and controlled by unlicensed individuals, and which illegally split fees with unlicensed individuals.

(iv)    In many cases, the NF-3 forms and treatment reports submitted by and on behalf of the Defendants misrepresented to GEICO that the Provider Defendants were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that supposedly were performed. In fact, the Provider Defendants were not eligible to seek or pursue collection of No-Fault Benefits for the services that supposedly were performed because the services were not provided by the Provider Defendants' employees

V.    **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

475.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

476.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

477.    Specifically, they knowingly misrepresented and concealed facts related to the Provider Defendants in an effort to prevent discovery that the Provider Defendants were fraudulently licensed, unlawfully split fees with unlicensed persons, and/or unlawfully paid kickbacks for patient referrals.

478.    Additionally, the Defendants entered into complex financial arrangements with one another and with others that were designed to, and did, conceal that fact that the Provider Defendants were fraudulently licensed, unlawfully split fees with unlicensed persons, and unlawfully paid kickbacks in exchange for patient referrals.

479.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed pursuant to a fraudulent predetermined protocol designed to maximize the charges that could be submitted.

480.    In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the physicians, nurse practitioners, physical therapists, and unlicensed individuals with the Provider Defendants in order to prevent GEICO from discovering that the physicians, acupuncturists, chiropractors, physical therapists, technicians, and unlicensed individuals performing many of the Fraudulent Services – to the extent that they were performed at

all – were not employed by the Provider Defendants. In many cases, the Defendants actually misrepresented the identity of the individual who purportedly performed the Fraudulent Services, or falsely claimed that the individuals providing the Fraudulent Services were employees of the Provider Defendants, in order to conceal the fact that the services were performed by independent contractors.

481.    What is more, the Defendants billed for the Fraudulent Services through multiple individuals and entities using multiple tax identification numbers in order to reduce the amount of billing submitted through any single individual or entity or under any single tax identification number, thereby preventing GEICO from identifying the pattern of fraudulent charges submitted through any one entity.

482.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

483.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $1,800,000.00 based upon the fraudulent charges.

484.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against the Provider Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

485.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

486.    There is an actual case in controversy between GEICO and the Provider Defendants regarding more than $2,700,000.00 in fraudulent billing for the Fraudulent Services that has been submitted to GEICO.

487.    In particular, as part of the more than $2,700,000.00 in billing for the Fraudulent Services that has been submitted to GEICO and remains in controversy, there is pending billing in dispute between GEICO and (i) NQ Medical in the amount of approximately $958,000.00; (ii) Sedani Medical in the amount of approximately $337,000.00; (iii) Rapapuncture in the amount of approximately $332,000.00; (iv) Aminova Acupuncture in the amount of approximately $87,000.00; (v) Bright Acupuncture in the amount of approximately $224,138.20; (vi) YC Acupuncture in the amount of approximately $67,000.00; (vii) Choi Acupuncture in the amount of approximately $59,000.00; (viii) Good Care PT in the amount of approximately $103,000.00; (ix) Evergreen PT in the amount of approximately $100,000.00; (x) Four Seasons Chiro in the amount of approximately $36,000.00; (xi) ASAP Chiro in the amount of approximately $371,000.00; and (xii) Kimmel Chiro in the amount of approximately $101,000.00.

488.    The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

489.    The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the Fraudulent Services misrepresented

and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

490. The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by the Provider Defendants' employees.

491. The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the Provider Defendants were fraudulently licensed, owned, and controlled by unlicensed individuals and, therefore, were ineligible to bill for or to collect no-fault benefits.

492. The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the Provider Defendants unlawfully split fees with unlicensed individuals and, therefore, were ineligible to bill for or to collect No-Fault Benefits.

493. The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the Provider Defendants have failed and/or refused to comply with GEICO's lawful requests for additional verification.

494. Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO.

## SECOND CAUSE OF ACTION
### Against Basu and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

495. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

496.     NQ Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

497.     Basu, Singh, Millennium Health, and John Doe Defendants 1-5 knowingly conducted and/or participated, directly or indirectly, in the conduct of the NQ Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that NQ Medical was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by NQ Medical employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

498.     NQ Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Basu and the Management Defendants operated NQ Medical, inasmuch as NQ Medical never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for NQ Medical to function. Furthermore, the intricate planning

required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through NQ Medical to the present day.

499.    NQ Medical is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently licensed, owned and controlled by non-physicians, and unlawfully pays for patient referrals. NQ Medical likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by NQ Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

500.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $383,000.00 pursuant to the fraudulent bills submitted by the Defendants through NQ Medical.

501.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**Against Basu and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

502.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

503.    NQ Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

504.     Basu, Singh, Millennium Health, and John Doe Defendants 1-5 are employed by and/or associated with NQ Medical.

505.     Basu, Singh, Millennium Health, and John Doe Defendants 1-5  knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the NQ Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that NQ Medical was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by NQ Medical employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

506.     Basu, Singh, Millennium Health, and John Doe Defendants 1-5 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

507. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $383,000.00 pursuant to the fraudulent bills submitted by the Defendants through the NQ Medical.

508. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against NQ Medical, Basu, and the Management Defendants
### (Common Law Fraud)

509. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

510. NQ Medical, Basu, Singh, Millennium Health, and John Doe Defendants 1-5 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

511. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that NQ Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non-physicians; (ii) in every claim, the representation that NQ Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact NQ Medical was not properly licensed in that it engaged in illegal fee-splitting with non-physicians; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for

services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; (iv) in every claim for services not actually performed by Basu, the representation that the billed-for services were performed by NQ Medical's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

512.   NQ Medical, Basu, Singh, Millennium Health, and John Doe Defendants 1-5 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through NQ Medical that were not compensable under the No-Fault Laws.

513.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $383,000.00 pursuant to the fraudulent bills submitted by the Defendants through NQ Medical.

514.   The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

515.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against NQ Medical, Basu, and the Management Defendants**
**(Unjust Enrichment)**

516.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

517.     As set forth above, NQ Medical, Basu, Singh, Millennium Health, and John Doe Defendants 1-5 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

518.     When GEICO paid the bills and charges submitted by or on behalf of NQ Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

519.     NQ Medical, Basu, Singh, Millennium Health, and John Doe Defendants 1-5 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

520.     Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

521.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $383,034.30.

## SIXTH CAUSE OF ACTION
### Against Sedani and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

522.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

523.     Sedani Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

524.     Sedani, Singh, Millennium Health, and John Doe Defendants 1-5 knowingly conducted and/or participated, directly or indirectly, in the conduct of the Sedani Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal

mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that Sedani Medical was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Sedani Medical employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2."

525.    Sedani Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Sedani and the Management Defendants operated Sedani Medical, inasmuch as Sedani Medical never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Sedani Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Sedani Medical to the present day.

526.     Sedani Medical is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently licensed, owned and controlled by non-physicians, and unlawfully pays for patient referrals. Sedani Medical likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Sedani Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

527.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $177,000.00 pursuant to the fraudulent bills submitted by the Defendants through Sedani Medical.

528.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### SEVENTH CAUSE OF ACTION
### Against Sedani and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

529.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

530.     Sedani Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

531.     Sedani, Singh, Millennium Health, and John Doe Defendants 1-5 are employed by and/or associated with Sedani Medical.

532.     Sedani, Singh, Millennium Health, and John Doe Defendants 1-5  knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct

114

of the Sedani Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that Sedani Medical was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Sedani Medical employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

533. Sedani, Singh, Millennium Health, and John Doe Defendants 1-5 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

534. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $177,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Sedani Medical.

535.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**EIGHTH CAUSE OF ACTION**
**Against Sedani and the Management Defendants**
**(Common Law Fraud)**

536.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

537.     Sedani Medical, Sedani, Singh, Millennium Health, and John Doe Defendants 1-5 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

538.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Sedani Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non-physicians; (ii) in every claim, the representation that Sedani Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact Sedani Medical was not properly licensed in that it engaged in illegal fee-splitting with non-physicians; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; (iv) in every claim for services not actually performed by Sedani, the representation that the

billed-for services were performed by Sedani Medical's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

539.    Sedani Medical, Sedani, Singh, Millennium Health, and John Doe Defendants 1-5 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Sedani Medical that were not compensable under the No-Fault Laws.

540.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $177,000.00 pursuant to the fraudulent bills submitted by the Defendants through Sedani Medical.

541.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

542.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION
### Against Sedani and the Management Defendants
### (Unjust Enrichment)

543.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

544.    As set forth above, Sedani Medical, Sedani, Singh, Millennium Health, and John Doe Defendants 1-5 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

545.   When GEICO paid the bills and charges submitted by or on behalf of Sedani Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

546.   Sedani Medical, Sedani, Singh, Millennium Health, and John Doe Defendants 1-5 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

547.   Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

548.   By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $177,011.16.

**TENTH CAUSE OF ACTION**
**Against Rapaport and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

549.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

550.   Rapapuncture is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

551.   Rapaport, Singh, Millennium Health, and John Doe Defendants 1-5 knowingly conducted and/or participated, directly or indirectly, in the conduct of the Rapapuncture's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that Rapapuncture was not eligible to receive under the No-Fault Laws because: (i) it

was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Rapapuncture employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3."

552.    Rapapuncture's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Rapaport and the Management Defendants operated Rapapuncture, inasmuch as Rapapuncture never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Rapapuncture to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Rapapuncture to the present day.

553.    Rapapuncture is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently licensed, owned and controlled by non-physicians, and unlawfully pays for patient referrals. Rapapuncture likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by

Rapapuncture in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

554.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $141,000.00 pursuant to the fraudulent bills submitted by the Defendants through Rapapuncture.

555.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## ELEVENTH CAUSE OF ACTION
### Against Rapaport and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

556.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

557.    Rapapuncture is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

558.    Rapaport, Singh, Millennium Health, and John Doe Defendants 1-5 are employed by and/or associated with Rapapuncture.

559.    Rapaport, Singh, Millennium Health, and John Doe Defendants 1-5  knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Rapapuncture's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that Rapapuncture was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled

by non-physicians; (ii) it engaged in fee-splitting with non-physicians; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Rapapuncture employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3." Each such mailing was made in furtherance of the mail fraud scheme.

560.    Rapaport, Singh, Millennium Health, and John Doe Defendants 1-5 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

561.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $141,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Rapapuncture.

562.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**TWELFTH CAUSE OF ACTION**
**Against Rapapuncture, Rapaport, and the Management Defendants**
**(Common Law Fraud)**

563.    GEICO incorporates, as though fully set forth herein, each and every allegation in

the paragraphs above.

564. Rapapuncture, Rapaport, Singh, Millennium Health, and John Doe Defendants 1-5 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

565. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Rapapuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non-physicians; (ii) in every claim, the representation that Rapapuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact Rapapuncture was not properly licensed in that it engaged in illegal fee-splitting with non-physicians; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; (iv) in every claim for services not actually performed by Rapaport, the representation that the billed-for services were performed by Rapapuncture's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

566. Rapapuncture, Rapaport, Singh, Millennium Health, and John Doe Defendants 1-5 intentionally made the above-described false and fraudulent statements and concealed material

facts in a calculated effort to induce GEICO to pay charges submitted through Rapapuncture that were not compensable under the No-Fault Laws.

567.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $141,000.00 pursuant to the fraudulent bills submitted by the Defendants through Rapapuncture.

568.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

569.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**THIRTEENTH CAUSE OF ACTION**
**Against Rapapuncture, Rapaport, and the Management Defendants**
**(Unjust Enrichment)**

570.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

571.    As set forth above, Rapapuncture, Rapaport, Singh, Millennium Health, and John Doe Defendants 1-5 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

572.    When GEICO paid the bills and charges submitted by or on behalf of Rapapuncture for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

573.    Rapapuncture, Rapaport, Singh, Millennium Health, and John Doe Defendants 1-5 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that

Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

574.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

575.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $141,548.70.

## FOURTEENTH CAUSE OF ACTION
### Against Aminova and the Management Defendants
### (Common Law Fraud)

576.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

577.    Aminova Acupuncture, Aminova, Singh, Millennium Health, and John Doe Defendants 1-5 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

578.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Aminova Acupuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non-physicians; (ii) in every claim, the representation that Aminova Acupuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact Aminova Acupuncture was not properly licensed in that it engaged in illegal fee-splitting with non-physicians; and (iii) in every claim, the representation that the billed-for services were medically necessary, when in

fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all.

579.    Aminova Acupuncture, Aminova, Singh, Millennium Health, and John Doe Defendants 1-5  intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Aminova Acupuncture that were not compensable under the No-Fault Laws.

580.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $35,000.00 pursuant to the fraudulent bills submitted by the Defendants through Aminova Acupuncture.

581.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

582.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTEENTH CAUSE OF ACTION
### Against Aminova and the Management Defendants
### (Unjust Enrichment)

583.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

584.    As set forth above, Aminova Acupuncture, Aminova, Singh, Millennium Health, and John Doe Defendants 1-5 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

585.    When GEICO paid the bills and charges submitted by or on behalf of Aminova Acupuncture for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

586.    Aminova Acupuncture, Aminova, Singh, Millennium Health, and John Doe Defendants 1-5 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

587.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

588.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $35,689.29.

### SIXTEENTH CAUSE OF ACTION
**Against Bright and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

589.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

590.    Bright Acupuncture is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

591.    Bright, Singh, Millennium Health, and John Doe Defendants 1-5 knowingly conducted and/or participated, directly or indirectly, in the conduct of the Bright Acupuncture's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Bright Acupuncture was not eligible to receive under the No-Fault Laws

because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5."

592.    Bright Acupuncture's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Bright and the Management Defendants operated Bright Acupuncture, inasmuch as Bright Acupuncture never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Bright Acupuncture to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Bright Acupuncture to the present day.

593.    Bright Acupuncture is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently licensed, owned and controlled by non-physicians, and unlawfully pays for patient referrals. Bright Acupuncture likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Bright

Acupuncture in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

594.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $172,000.00 pursuant to the fraudulent bills submitted by the Defendants through Bright Acupuncture.

595.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**SEVENTEENTH CAUSE OF ACTION**
**Against Bright and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

596.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

597.    Bright Acupuncture is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

598.    Bright, Singh, Millennium Health, and John Doe Defendants 1-5 are employed by and/or associated with Bright Acupuncture.

599.    Bright, Singh, Millennium Health, and John Doe Defendants 1-5  knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Bright Acupuncture's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Bright Acupuncture was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-

physicians; (ii) it engaged in fee-splitting with non-physicians; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5." Each such mailing was made in furtherance of the mail fraud scheme.

600.    Bright, Singh, Millennium Health, and John Doe Defendants 1-5 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

601.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $172,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Bright Acupuncture.

602.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## EIGHTEENTH CAUSE OF ACTION
### Against Bright and the Management Defendants
### (Common Law Fraud)

603.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

604.     Bright Acupuncture, Bright, Singh, Millennium Health, and John Doe Defendants 1-5 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

605.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Bright Acupuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non-physicians; (ii) in every claim, the representation that Bright Acupuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact Bright Acupuncture was not properly licensed in that it engaged in illegal fee-splitting with non-physicians; and (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all.

606.     Bright Acupuncture, Bright, Singh, Millennium Health, and John Doe Defendants 1-5  intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Bright Acupuncture that were not compensable under the No-Fault Laws.

607.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $172,000.00 pursuant to the fraudulent bills submitted by the Defendants through Bright Acupuncture.

608.   The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

609.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## NINETEENTH CAUSE OF ACTION
### Against Bright and the Management Defendants
### (Unjust Enrichment)

610.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

611.   As set forth above, Bright Acupuncture, Bright, Singh, Millennium Health, and John Doe Defendants 1-5 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

612.   When GEICO paid the bills and charges submitted by or on behalf of Bright Acupuncture for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

613.   Bright Acupuncture, Bright, Singh, Millennium Health, and John Doe Defendants 1-5 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

614.   Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

615.   By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $172,866.46.

**TWENTIETH CAUSE OF ACTION**
**Against Choi and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

616.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

617.    YC Acupuncture is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

618.    Choi, Singh, Millennium Health, and John Doe Defendants 1-5 knowingly conducted and/or participated, directly or indirectly, in the conduct of the YC Acupuncture's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over four years seeking payments that YC Acupuncture was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6."

619.    YC Acupuncture's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail

fraud are the regular way in which Choi and the Management Defendants operated YC Acupuncture, inasmuch as YC Acupuncture never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for YC Acupuncture to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through YC Acupuncture to the present day.

620.    YC Acupuncture is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently licensed, owned and controlled by non-physicians, and unlawfully pays for patient referrals. YC Acupuncture likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by YC Acupuncture in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

621.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $72,000.00 pursuant to the fraudulent bills submitted by the Defendants through YC Acupuncture.

622.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**TWENTY-FIRST CAUSE OF ACTION**
**Against Choi and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

623.    GEICO incorporates, as though fully set forth herein, each and every allegation in

the paragraphs above.

624.    YC Acupuncture is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

625.    Choi, Singh, Millennium Health, and John Doe Defendants 1-5 are employed by and/or associated with YC Acupuncture.

626.    Choi, Singh, Millennium Health, and John Doe Defendants 1-5  knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the YC Acupuncture's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over four years seeking payments that YC Acupuncture was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6." Each such mailing was made in furtherance of the mail fraud scheme.

627.    Choi, Singh, Millennium Health, and John Doe Defendants 1-5 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other

insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

628.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $72,000.00 pursuant to the fraudulent bills submitted by the Defendants through the YC Acupuncture.

629.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTY-SECOND CAUSE OF ACTION
**Against Choi and the Management Defendants**
**(Common Law Fraud)**

630.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

631.    YC Acupuncture, Choi, Singh, Millennium Health, and John Doe Defendants 1-5 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

632.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that YC Acupuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non-physicians; (ii) in every claim, the representation that YC Acupuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact YC Acupuncture was

not properly licensed in that it engaged in illegal fee-splitting with non-physicians; and (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all.

633.    YC Acupuncture, Choi, Singh, Millennium Health, and John Doe Defendants 1-5 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through YC Acupuncture that were not compensable under the No-Fault Laws.

634.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $72,000.00 pursuant to the fraudulent bills submitted by the Defendants through YC Acupuncture.

635.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

636.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-THIRD CAUSE OF ACTION
### Against Choi and the Management Defendants
### (Unjust Enrichment)

637.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

638.   As set forth above, YC Acupuncture, Choi, Singh, Millennium Health, and John Doe Defendants 1-5 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

639.   When GEICO paid the bills and charges submitted by or on behalf of YC Acupuncture for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

640.   YC Acupuncture, Choi, Singh, Millennium Health, and John Doe Defendants 1-5 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

641.   Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

642.   By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $72,689.82.

## TWENTY-FOURTH CAUSE OF ACTION
### Against Choi and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

643.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

644.   Choi Acupuncture is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

645.   Choi, Singh, Millennium Health, and John Doe Defendants 1-5 knowingly conducted and/or participated, directly or indirectly, in the conduct of the Choi Acupuncture's affairs through a pattern of racketeering activity consisting of repeated violations of the federal

mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over a year and half seeking payments that Choi Acupuncture was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "7."

646.    Choi Acupuncture's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Choi and the Management Defendants operated Choi Acupuncture, inasmuch as Choi Acupuncture never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Choi Acupuncture to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Choi Acupuncture to the present day.

647.    Choi Acupuncture is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently licensed, owned and controlled by

non-physicians, and unlawfully pays for patient referrals. Choi Acupuncture likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Choi Acupuncture in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

648.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $52,000.00 pursuant to the fraudulent bills submitted by the Defendants through Choi Acupuncture.

649.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTY-FIFTH CAUSE OF ACTION
### Against Choi and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

650.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

651.     Choi Acupuncture is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

652.     Choi, Singh, Millennium Health, and John Doe Defendants 1-5 are employed by and/or associated with Choi Acupuncture.

653.     Choi, Singh, Millennium Health, and John Doe Defendants 1-5  knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Choi Acupuncture's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United

States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over a year and a half seeking payments that Choi Acupuncture was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "7." Each such mailing was made in furtherance of the mail fraud scheme.

654.    Choi, Singh, Millennium Health, and John Doe Defendants 1-5 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

655.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $52,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Choi Acupuncture.

656.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTY-SIXTH CAUSE OF ACTION
### Against Choi and the Management Defendants

**(Common Law Fraud)**

657.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

658.    Choi Acupuncture, Choi, Singh, Millennium Health, and John Doe Defendants 1-5 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

659.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Choi Acupuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non-physicians; (ii) in every claim, the representation that Choi Acupuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact Choi Acupuncture was not properly licensed in that it engaged in illegal fee-splitting with non-physicians; and (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all.

660.    Choi Acupuncture, Choi, Singh, Millennium Health, and John Doe Defendants 1-5  intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Choi Acupuncture that were not compensable under the No-Fault Laws.

661.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $52,000.00 pursuant to the fraudulent bills submitted by the Defendants through Choi Acupuncture.

662.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

663.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TWENTY-SEVENTH CAUSE OF ACTION**
**Against Choi and the Management Defendants**
**(Unjust Enrichment)**

664.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

665.    As set forth above, Choi Acupuncture, Choi, Singh, Millennium Health, and John Doe Defendants 1-5 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

666.    When GEICO paid the bills and charges submitted by or on behalf of Choi Acupuncture for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

667.    Choi Acupuncture, Choi, Singh, Millennium Health, and John Doe Defendants 1-5 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

142

668.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

669.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $52,236.20.

## TWENTY-EIGHTH CAUSE OF ACTION
### Against S. Kim and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

670.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

671.    Good Care PT is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

672.    S. Kim, Singh, Millennium Health, and John Doe Defendants 1-5 knowingly conducted and/or participated, directly or indirectly, in the conduct of the Good Care PT's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Good Care PT was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Good Care PT employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the

fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "8."

673.    Good Care PT's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which S. Kim and the Management Defendants operated Good Care PT, inasmuch as Good Care PT never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Good Care PT to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Good Care PT to the present day.

674.    Good Care PT is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently licensed, owned and controlled by non-physicians, and unlawfully pays for patient referrals. Good Care PT likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Good Care PT in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

675.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $321,000.00 pursuant to the fraudulent bills submitted by the Defendants through Good Care PT.

676.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**TWENTY-NINTH CAUSE OF ACTION**
**Against S. Kim and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

677.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

678.    Good Care PT is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

679.    S. Kim, Singh, Millennium Health, and John Doe Defendants 1-5 are employed by and/or associated with Good Care PT.

680.    S. Kim, Singh, Millennium Health, and John Doe Defendants 1-5  knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Good Care PT's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Good Care PT was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Good Care PT employees; and (v) the billing codes used for the services misrepresented and exaggerated the

level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "8". Each such mailing was made in furtherance of the mail fraud scheme.

681.    S. Kim, Singh, Millennium Health, and John Doe Defendants 1-5 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

682.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $321,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Good Care PT.

683.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**THIRTIETH CAUSE OF ACTION**
**Against Good Care PT, S. Kim, and the Management Defendants**
**(Common Law Fraud)**

684.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

685.    Good Care PT, S. Kim, Singh, Millennium Health, and John Doe Defendants 1-5 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

686.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Good Care PT was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non-physicians; (ii) in every claim, the representation that Good Care PT was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact Good Care PT was not properly licensed in that it engaged in illegal fee-splitting with non-physicians; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; (iv) in every claim for services not actually performed by S. Kim, the representation that the billed-for services were performed by Good Care PT's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

687.    Good Care PT, S. Kim, Singh, Millennium Health, and John Doe Defendants 1-5 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Good Care PT that were not compensable under the No-Fault Laws.

688.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $321,000.00 pursuant to the fraudulent bills submitted by the Defendants through Good Care PT.

689.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

690.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**THIRTY-FIRST CAUSE OF ACTION**
**Against Good Care PT, S. Kim, and the Management Defendants**
**(Unjust Enrichment)**

691.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

692.     As set forth above, Good Care PT, S. Kim, Singh, Millennium Health, and John Doe Defendants 1-5 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

693.     When GEICO paid the bills and charges submitted by or on behalf of Good Care PT for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

694.     Good Care PT, S. Kim, Singh, Millennium Health, and John Doe Defendants 1-5 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

695.     Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

696.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $321,068.64.

## THIRTY-SECOND CAUSE OF ACTION
### Against H. Kim and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

697.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

698.    Evergreen PT is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

699.    H. Kim, Singh, Millennium Health, and John Doe Defendants 1-5 knowingly conducted and/or participated, directly or indirectly, in the conduct of the Evergreen PT's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Evergreen PT was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Evergreen PT employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "9."

700.    Evergreen PT's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which H. Kim and the Management Defendants operated Evergreen PT, inasmuch as Evergreen PT never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Evergreen PT to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Evergreen PT to the present day.

701.    Evergreen PT is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently licensed, owned and controlled by non-physicians, and unlawfully pays for patient referrals. Evergreen PT likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Evergreen PT in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

702.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $94,000.00 pursuant to the fraudulent bills submitted by the Defendants through Evergreen PT.

703.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**THIRTY-THIRD CAUSE OF ACTION**
**Against H. Kim and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

704.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

705.     Evergreen PT is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

706.     H. Kim, Singh, Millennium Health, and John Doe Defendants 1-5 are employed by and/or associated with Evergreen PT.

707.     H. Kim, Singh, Millennium Health, and John Doe Defendants 1-5  knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Evergreen PT's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Evergreen PT was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Evergreen PT employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "9." Each such mailing was made in furtherance of the mail fraud scheme.

708.     H. Kim, Singh, Millennium Health, and John Doe Defendants 1-5 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

709.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $94,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Evergreen PT.

710.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRTY-FOURTH CAUSE OF ACTION
### Against Evergreen PT, H. Kim, and the Management Defendants
### (Common Law Fraud)

711.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

712.     Evergreen PT, H. Kim, Singh, Millennium Health, and John Doe Defendants 1-5 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

713.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Evergreen PT was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non-physicians; (ii) in every claim, the representation that Evergreen PT

was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact Evergreen PT was not properly licensed in that it engaged in illegal fee-splitting with non-physicians; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; (iv) in every claim for services not actually performed by H. Kim, the representation that the billed-for services were performed by Evergreen PT's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

714.     Evergreen PT, H. Kim, Singh, Millennium Health, and John Doe Defendants 1-5 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Evergreen PT that were not compensable under the No-Fault Laws.

715.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $94,000.00 pursuant to the fraudulent bills submitted by the Defendants through Evergreen PT.

716.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

717.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**THIRTY-FIFTH CAUSE OF ACTION**
**Against Evergreen PT, H. Kim, and the Management Defendants**

**(Unjust Enrichment)**

718.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

719.   As set forth above, Evergreen PT, H. Kim, Singh, Millennium Health, and John Doe Defendants 1-5 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

720.   When GEICO paid the bills and charges submitted by or on behalf of Evergreen PT for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

721.   Evergreen PT, H. Kim, Singh, Millennium Health, and John Doe Defendants 1-5 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

722.   Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

723.   By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $94,790.17.

### THIRTY-SIXTH CAUSE OF ACTION
**Against Lee and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

724.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

725.   Four Seasons Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

726.    Lee, Singh, Millennium Health, and John Doe Defendants 1-5 knowingly conducted and/or participated, directly or indirectly, in the conduct of the Four Seasons Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over a year and a half seeking payments that Four Seasons Chiro was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Four Seasons Chiro employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "10."

727.    Four Seasons Chiro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Lee and the Management Defendants operated Four Seasons Chiro, inasmuch as Four Seasons Chiro never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Four Seasons Chiro to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants

continue to attempt collection on the fraudulent billing submitted through Four Seasons Chiro to the present day.

728.    Four Seasons Chiro is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently licensed, owned and controlled by non-physicians, and unlawfully pays for patient referrals. Four Seasons Chiro likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Four Seasons Chiro in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

729.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $69,000.00 pursuant to the fraudulent bills submitted by the Defendants through Four Seasons Chiro.

730.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THIRTY-SEVENTH CAUSE OF ACTION
**Against Lee and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

731.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

732.    Four Seasons Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

733.    Lee, Singh, Millennium Health, and John Doe Defendants 1-5 are employed by and/or associated with Four Seasons Chiro.

734.     Lee, Singh, Millennium Health, and John Doe Defendants 1-5  knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Four Seasons Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over a year and a half seeking payments that Four Seasons Chiro was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Four Seasons Chiro employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "10." Each such mailing was made in furtherance of the mail fraud scheme.

735.     Lee, Singh, Millennium Health, and John Doe Defendants 1-5 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

736.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $69,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Four Seasons Chiro.

737.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**THIRTY-EIGHTH CAUSE OF ACTION**
**Against Four Seasons Chiro, Lee, and the Management Defendants**
**(Common Law Fraud)**

738.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

739.     Four Seasons Chiro, Lee, Singh, Millennium Health, and John Doe Defendants 1-5 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

740.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Four Seasons Chiro was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non-physicians; (ii) in every claim, the representation that Four Seasons Chiro was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact Four Seasons Chiro was not properly licensed in that it engaged in illegal fee-splitting with non-physicians; (iii) in every claim, the representation that the billed-for services were medically necessary, when in

fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; (iv) in every claim for services not actually performed by Lee, the representation that the billed-for services were performed by Four Seasons Chiro's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

741.    Four Seasons Chiro, Lee, Singh, Millennium Health, and John Doe Defendants 1-5  intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Four Seasons Chiro that were not compensable under the No-Fault Laws.

742.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $69,000.00 pursuant to the fraudulent bills submitted by the Defendants through Four Seasons Chiro.

743.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

744.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THIRTY-NINTH CAUSE OF ACTION
**Against Four Seasons Chiro, Lee, and the Management Defendants**
**(Unjust Enrichment)**

745.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

746.     As set forth above, Four Seasons Chiro, Lee, Singh, Millennium Health, and John Doe Defendants 1-5 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

747.     When GEICO paid the bills and charges submitted by or on behalf of Four Seasons Chiro for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

748.     Four Seasons Chiro, Lee, Singh, Millennium Health, and John Doe Defendants 1-5 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

749.     Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

750.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $69,629.01.

## FORTIETH CAUSE OF ACTION
### Against Park and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

751.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

752.     ASAP Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

753.     Park, Singh, Millennium Health, and John Doe Defendants 1-5 knowingly conducted and/or participated, directly or indirectly, in the conduct of the ASAP Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail

fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that ASAP Chiro was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by ASAP Chiro employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "11."

754.    ASAP Chiro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Park and the Management Defendants operated ASAP Chiro, inasmuch as ASAP Chiro never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for ASAP Chiro to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through ASAP Chiro to the present day.

755.    ASAP Chiro is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently licensed, owned and controlled by non-

physicians, and unlawfully pays for patient referrals. ASAP Chiro likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by ASAP Chiro in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

756.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $562,000.00 pursuant to the fraudulent bills submitted by the Defendants through ASAP Chiro.

757.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FORTY-FIRST CAUSE OF ACTION
### Against Park and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

758.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

759.    ASAP Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

760.    Park, Singh, Millennium Health, and John Doe Defendants 1-5 are employed by and/or associated with ASAP Chiro.

761.    Park, Singh, Millennium Health, and John Doe Defendants 1-5  knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the ASAP Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United

States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that ASAP Chiro was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by ASAP Chiro employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "11." Each such mailing was made in furtherance of the mail fraud scheme.

762.    Park, Singh, Millennium Health, and John Doe Defendants 1-5 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

763.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $562,000.00 pursuant to the fraudulent bills submitted by the Defendants through the ASAP Chiro.

764.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FORTY-SECOND CAUSE OF ACTION
### Against ASAP Chiro, Park, and the Management Defendants
### (Common Law Fraud)

765. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

766. ASAP Chiro, Park, Singh, Millennium Health, and John Doe Defendants 1-5 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

767. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that ASAP Chiro was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non-physicians; (ii) in every claim, the representation that ASAP Chiro was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact ASAP Chiro was not properly licensed in that it engaged in illegal fee-splitting with non-physicians; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; (iv) in every claim for services not actually performed by Park, the representation that the billed-for services were performed by ASAP Chiro's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

768.     ASAP Chiro, Park, Singh, Millennium Health, and John Doe Defendants 1-5 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through ASAP Chiro that were not compensable under the No-Fault Laws.

769.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $562,000.00 pursuant to the fraudulent bills submitted by the Defendants through ASAP Chiro.

770.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

771.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FORTY-THIRD CAUSE OF ACTION
**Against ASAP Chiro, Park, and the Management Defendants**
**(Unjust Enrichment)**

772.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

773.     As set forth above, ASAP Chiro, Park, Singh, Millennium Health, and John Doe Defendants 1-5 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

774.     When GEICO paid the bills and charges submitted by or on behalf of ASAP Chiro for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

775.     ASAP Chiro, Park, Singh, Millennium Health, and John Doe Defendants 1-5 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

776.     Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

777.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $135,812.62.

**FORTY-FOURTH CAUSE OF ACTION**
**Against Kimmel and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

778.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

779.     Kimmel Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

780.     Kimmel, Singh, Millennium Health, and John Doe Defendants 1-5 knowingly conducted and/or participated, directly or indirectly, in the conduct of the Kimmel Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that Kimmel Chiro was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians; (iii) the billed-for services were not medically necessary, were performed

pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "12."

781.   Kimmel Chiro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Kimmel and the Management Defendants operated Kimmel Chiro, inasmuch as Kimmel Chiro never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Kimmel Chiro to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Kimmel Chiro to the present day.

782.   Kimmel Chiro is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently licensed, owned and controlled by non-physicians, and unlawfully pays for patient referrals. Kimmel Chiro likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Kimmel Chiro in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

783.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $222,000.00 pursuant to the fraudulent bills submitted by the Defendants through Kimmel Chiro.

784.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### FORTY-FIFTH CAUSE OF ACTION
**Against Kimmel and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

785.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

786.    Kimmel Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

787.    Kimmel, Singh, Millennium Health, and John Doe Defendants 1-5 are employed by and/or associated with Kimmel Chiro.

788.    Kimmel, Singh, Millennium Health, and John Doe Defendants 1-5  knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Kimmel Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that Kimmel Chiro was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol

designed solely to enrich the Defendants, and frequently were not performed at all; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "12." Each such mailing was made in furtherance of the mail fraud scheme.

789.    Kimmel, Singh, Millennium Health, and John Doe Defendants 1-5 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

790.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $222,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Kimmel Chiro.

791.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FORTY-SIXTH CAUSE OF ACTION
### Against Kimmel and the Management Defendants
### (Common Law Fraud)

792.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

793.    Kimmel Chiro, Kimmel, Singh, Millennium Health, and John Doe Defendants 1-5 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and

concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

794.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Kimmel Chiro was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non-physicians; (ii) in every claim, the representation that Kimmel Chiro was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact Kimmel Chiro was not properly licensed in that it engaged in illegal fee-splitting with non-physicians; and (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all.

795.    Kimmel Chiro, Kimmel, Singh, Millennium Health, and John Doe Defendants 1-5 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Kimmel Chiro that were not compensable under the No-Fault Laws.

796.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $222,000.00 pursuant to the fraudulent bills submitted by the Defendants through Kimmel Chiro.

797.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

798. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FORTY-SEVENTH CAUSE OF ACTION
### Against Kimmel and the Management Defendants
### (Unjust Enrichment)

799. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above.

800. As set forth above, Kimmel Chiro, Kimmel, Singh, Millennium Health, and John Doe Defendants 1-5 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

801. When GEICO paid the bills and charges submitted by or on behalf of Kimmel Chiro for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

802. Kimmel Chiro, Kimmel, Singh, Millennium Health, and John Doe Defendants 1-5 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

803. Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

804. By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $222,163.39.

## JURY DEMAND

805.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.      On the First Cause of Action against the Provider Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO;

B.      On the Second Cause of Action against Basu, Singh, and Millennium Health, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $383,034.30, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against Basu, Singh, and Millennium Health, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $383,034.30, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against NQ Medical, Basu, Singh, and Millennium Health, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of  $383,034.30, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against NQ Medical, Basu, Singh, and Millennium Health, more than $383,034.30 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against Sedani, Singh, and Millennium Health, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $177,011.16, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

G.      On the Seventh Cause of Action against Sedani, Singh, and Millennium Health, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $177,011.16, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.      On the Eighth Cause of Action against Sedani, Singh, and Millennium Health, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $177,011.16, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

I.      On the Ninth Cause of Action against Sedani, Singh, and Millennium Health, more than $177,011.16 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

J.      On the Tenth Cause of Action against Rapaport, Singh, and Millennium Health, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $141,548.70, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

K.      On the Eleventh Cause of Action against Rapaport, Singh, and Millennium Health, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $141,548.70, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

L.      On the Twelfth Cause of Action against Rapapuncture, Rapaport, Singh, and Millennium Health, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of  $141,548.70, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

M.      On the Thirteenth Cause of Action against Rapapuncture, Rapaport, Singh, and Millennium Health, more than $141,548.70 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

N.      On the Fourteenth Cause of Action against Aminova, Singh, and Millennium Health, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of  $35,689.29, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

O.      On the Fifteenth Cause of Action against Aminova, Singh, and Millennium Health, more than $35,689.29 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

P.      On the Sixteenth Cause of Action against Bright, Singh, and Millennium Health, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $172,866.46, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

Q.      On the Seventeenth Cause of Action against Bright, Singh, and Millennium Health, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $172,866.46, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

R.      On the Eighteenth Cause of Action against Bright, Singh, and Millennium Health, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $172,866.46, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

S.      On the Nineteenth Cause of Action against Bright, Singh, and Millennium Health, more than $172,866.46 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

T.      On the Twentieth Cause of Action against Choi, Singh, and Millennium Health, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $72,689.82, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

U.      On the Twenty-First Cause of Action against Choi, Singh, and Millennium Health, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $72,689.82, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

V.      On the Twenty-Second Cause of Action against YC Acupuncture, Choi, Singh, and Millennium Health, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of  $72,689.82, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

W.      On the Twenty-Third Cause of Action against YC Acupuncture, Choi, Singh, and Millennium Health, more than $72,689.82 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

X.      On the Twenty-Fourth Cause of Action against Choi, Singh, and Millennium Health, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $52,236.20, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

Y.      On the Twenty-Fifth Cause of Action against Choi, Singh, and Millennium Health, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $52,236.20, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

Z.      On the Twenty-Sixth Cause of Action against Choi, Singh, and Millennium Health, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of  $52,236.20, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

AA.     On the Twenty-Seventh Cause of Action against Choi, Singh, and Millennium Health, more than $52,236.20 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

BB.     On the Twenty-Eighth of Action against S. Kim, Singh, and Millennium Health, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $321,068.64, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

CC.     On the Twenty-Ninth Cause of Action against S. Kim, Singh, and Millennium Health, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $321,068.64, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

DD.     On the Thirtieth Cause of Action against Good Care PT, S. Kim, Singh, and Millennium Health, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $321,068.64, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

EE.     On the Thirty-First Cause of Action against Good Care PT, S. Kim, Singh, and Millennium Health, more than $321,068.64 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

FF.     On the Thirty-Second Cause of Action against H. Kim, Singh, and Millennium Health, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $94,790.17, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

GG.     On the Thirty-Thirty Cause of Action against H. Kim, Singh, and Millennium Health, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $94,790.17, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

HH.     On the Thirty-Fourth Cause of Action against Evergreen PT, H. Kim, Singh, and Millennium Health, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $94,790.17, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

II.      On the Thirty-Fifth Cause of Action against Evergreen PT, H. Kim, Singh, and Millennium Health, more than $94,790.17 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

JJ.      On the Thirty-Sixth Cause of Action against Lee, Singh, and Millennium Health, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $69,629.01, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

KK.      On the Thirty-Seventh Cause of Action against Lee, Singh, and Millennium Health, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $69,629.01, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

LL.      On the Thirty-Eighth Cause of Action against Four Seasons Chiro, Lee, Singh, and Millennium Health, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of  $69,629.01, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

MM.      On the Thirty-Ninth Cause of Action against Four Seasons Chiro, Lee, Singh, and Millennium Health, more than $69,629.01 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

NN.      On the Fortieth Cause of Action against Park, Singh, and Millennium Health, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $135,812.62, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

OO.    On the Forty-First Cause of Action against Park, Singh, and Millennium Health, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $135,812.62, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

PP.    On the Forty-Second Cause of Action against ASAP Chiro, Park, Singh, and Millennium Health, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of  $135,812.62, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

QQ.    On the Forty-Third Cause of Action against ASAP Chiro, Park, Singh, and Millennium Health, more than $135,812.62 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

RR.    On the Forty-Fourth Cause of Action against Kimmel, Singh, and Millennium Health, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $222,163.39, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

SS.    On the Forty-Fifth Cause of Action against Kimmel, Singh, and Millennium Health, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $222,163.39, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

TT.    On the Forty-Sixth Cause of Action against Kimmel, Singh, and Millennium Health, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of  $222,163.39, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

UU.     On the Forty-Seventh Cause of Action against Kimmel, Singh, and Millennium

Health, more than $222,163.39 for unjust enrichment, plus costs and interest and such other and

further relief as this Court deems just and proper.

Dated: Uniondale, New York
       September 15, 2020

                                        RIVKIN RADLER LLP

                               By:   /s/  Michael A. Sirignano
                                          Michael A. Sirignano (MS 5263)
                                          Barry I. Levy (BL 2190)
                                          Joshua D. Smith (JS 3989)
                                     926 RXR Plaza
                                     Uniondale, New York 11556
                                     (516) 357-3000

                                     *Counsel for Plaintiffs, Government Employees
                                     Insurance Company, GEICO Indemnity Company,
                                     GEICO General Insurance Company and GEICO
                                     Casualty Company*